Gerald **NICHOLS, et al., Plaintiffs,**

v.

**ST. LUKE CENTER OF HYDE PARK, et al., Defendants.**

No. C–1–92–370.

United States District Court,
S.D. Ohio, W.D.

June 9, 1992.

William Hambley, Cincinnati, Ohio, for plaintiffs.

Ann Hunsaker, Cincinnati, Ohio, for defendants.

## ORDER

CARL B. RUBIN, District Judge.

Following evidentiary hearings and arguments of counsel for all parties, this matter is before the Court upon Plaintiffs' complaint for preliminary and permanent injunctive relief, Plaintiffs' motion and memorandum in support of a temporary restraining order and preliminary injunctive relief, Defendants' memorandum in opposition to Plaintiffs' motion for a preliminary injunction, and Plaintiffs' motion and reply memorandum in support of preliminary injunctive relief. (Docs. 1, 2, 10, 11).

### Procedural History

Plaintiffs filed their complaint on April 30, 1992, seeking injunctive relief that would prevent Defendant St. Luke Center of Hyde Park ("St. Luke") from permanently discharging Plaintiff Gerald Nichols from Defendants' facility. (Doc. 1). Concurrent with that complaint, Plaintiffs filed a motion for a temporary restraining order that would require Defendants to readmit Plaintiff Nichols to St. Luke, pending resolution of his motion for a preliminary injunction. (Doc. 2).

On May 1, 1992, one day after a conference and hearing before Judge Herman J. Weber, the Court preliminarily denied Plaintiffs' motion for a temporary restraining order ["TRO"], and recessed the matter for additional evidence and arguments. (Doc. 4). On May 4, 1992, the Court reconvened and completed that evidentiary hearing. (*See* Docs. 6, 7). On May 5, 1992, Judge Weber denied Plaintiffs' TRO motion. (Doc. 8).

Defendants thereafter filed a memorandum in opposition to Plaintiff's motion for a preliminary injunction. (Doc. 10). On May 18, 1992, this Court held a hearing on Plaintiffs' motion for a preliminary injunction, at which time the parties presented additional evidence and arguments.

### Findings of Fact

1) Plaintiff Gerald Nichols is a 53-year-old resident of Cincinnati, Ohio, who sustained serious and permanent injuries in an airplane crash in 1960. Those injuries resulted in traumatic brain damage, partial blindness, epilepsy and partial left side paralysis. In addition, Plaintiff Nichols lost the use of both legs following a 1987 automobile accident. He now ambulates through the use of a motorized wheelchair that he controls.

2) Plaintiff Beverly Nordhausen, acting as "next friend" of Plaintiff Nichols, is a resident of Cincinnati, Ohio, and is Plaintiff Nichols' sister and legal guardian.

3) Defendant St. Luke Center of Hyde Park ("St. Luke") is a licensed nursing care facility, located in Cincinnati, Ohio, and owned and operated by Defendant Episcopal Retirement Homes, Inc., an Ohio corporation. Most of the facility's residents are elderly; many also suffer from Alzheimer's disease or other forms of senility, as well as from other physical or mental infirmities.

4) As a result of Plaintiff Nichols' various disabilities, the Ohio Department of Human Services has certified that only a nursing facility setting can meet his needs. Accordingly, Plaintiff Nichols became a Medicaid patient at St. Luke on February 2, 1989. From that date through April 10, 1992, Defendant St. Luke received monthly Medicaid reimbursement for Plaintiff Nichols' care.

5) Throughout Plaintiff Nichols' residency at St. Luke, he suffered from impulse control problems, manifested in inappropriate or disruptive behavior. From November 1991 through early January 1992, the documented incidence of such behavior problems escalated. Plaintiff Nichols exhibited physically and verbally abusive or threatening behavior toward other St. Luke's residents and staff members, including grabbing or striking with his right arm, and maneuvering his motorized wheelchair in a menacing manner.

6) Sometime between January 22, 1992 and February 4, 1992, by agreement of Plaintiff Nichols and St. Luke's staff, Plaintiff Nichols began a new course of treatment for his behavior problems. The agreed plan of care included a change of medication and a behavior modification program with a four-step process for addressing episodic behavior problems. The first step of that procedure called for Defendants to confine Plaintiff Nichols to his room when he appeared to be in an agitated state, and isolating him until he was able to interact in a rational manner. Subsequent steps involved allowing him to administer medication to himself, medicating him with his permission, and finally calling his doctor. No behavioral problems were reported during about the first two months of the new plan of care.

7) On March 30, 1992, Plaintiff Nichols became agitated when a lift mechanism tipped while being used to move him from his bed to his motorized wheelchair. Plaintiff Nichols then moved his wheelchair into the hallway, where he deliberately struck another elderly patient with his right arm.

8) On April 2, 1992, St. Luke's formally advised Plaintiffs that as a result of the safety hazard posed to other residents by Plaintiff Nichols' aggressive behavior, as evidenced by the March 30 incident as well as other previous incidents, the facility would discharge Plaintiff Nichols on April 10, 1992.

9) On April 10, 1992, St. Luke discharged Plaintiff Nichols to University Hospital. On May 1, 1992, after University Hospital determined that no further in-patient treatment was warranted, but before Plaintiffs were able to secure an alternative placement for Plaintiff Nichols, Plaintiff Nichols was discharged to Plaintiff Nordhausen's home.

10) To date, Plaintiffs have been unable to secure a suitable alternative placement for Plaintiff Nichols. Plaintiff Nichols remains at Plaintiff Nordhausen's home, where he is tended on a part-time basis by a private duty nurse, at Plaintiff Nordhausen's expense. Full-time home care would be cost prohibitive. Plaintiff Nordhausen's employment prevents her from personally providing Plaintiff Nichols with full-time care, and her home is not equipped for wheelchair accessibility.

11) Plaintiffs did not pursue an administrative appeal from Defendants' decision to discharge Plaintiff Nichols.

### The Parties' Claims

Plaintiffs claim that Defendants should be prevented from discharging Plaintiff Nichols from their facility due to Defendants' failure to adhere to federal provisions governing the treatment and care of Medicaid patients such as Plaintiff Nichols. Specifically, Plaintiffs argue that Defendants did not fulfill their statutory duty to provide those services necessary to reasonably accommodate Plaintiff Nichols' handicap. Plaintiffs assert that Defendants' own failure to adhere to the agreed-upon course of treatment for Plaintiff Nichols resulted in the March 30, 1992 incident, and that Plaintiff Nichols' discharge therefore is unwarranted.

Defendants assert that Plaintiffs have failed to exhaust their administrative remedies, and that this Court therefore lacks

subject matter jurisdiction over Plaintiffs' claims. Additionally, Defendants argue that Plaintiffs have failed to demonstrate entitlement to preliminary injunctive relief. They claim that nursing care facilities are authorized to discharge Medicaid patients whose presence endangers the safety of other individuals in the facility.

## OPINION

*Standard of Review for Preliminary Injunctive Relief*

To prevail on a motion for a preliminary injunction, a plaintiff must satisfy a four-prong test. *Southern Milk Sales, Inc. v. Martin,* 924 F.2d 98, 102–03 (6th Cir.1991). The four factors to which a court should give particular deference in deciding whether to grant a preliminary injunction are: 1) whether the plaintiff is likely to succeed on the merits; 2) whether the plaintiff will suffer irreparable injury absent preliminary injunctive relief; 3) whether the injunction would harm others; and 4) whether the injunction would serve the public interest. *Id.* (*citing In Re DeLorean Motor Co.,* 755 F.2d 1223, 1228 (6th Cir.1985).

*Applicable Law*

### 1. The Medicaid Act

Title XIX of the Social Security Act (the "Medicaid Act") mandates that nursing facilities participating in the Medicaid program provide specified services "to attain or maintain [residents'] highest practicable physical, mental, and psychosocial well-being," 42 U.S.C. § 1396r(b)(4)(A)(i), (ii), as well as provide "treatment and services required by mentally ill and mentally retarded residents not otherwise provided or arranged for (or required to be provided or arranged for) by the State." 42 U.S.C. § 1396r(b)(4)(A)(vii).

In addition, such nursing facilities may transfer or discharge residents from the facility only if certain conditions are met. 42 U.S.C. § 1396r(c)(2)(A). A facility must provide at least 30 days advance notice of its intent to transfer or discharge a resident, except in narrow circumstances defined by statute. 42 U.S.C. § 1396r(c)(2)(B). One of those exceptions is where a threat to the safety of other individuals in the facility motivates the transfer or discharge. 42 U.S.C. § 1396r(c)(2)(A)(iii), (B)(ii)(I). In such instances, notice must be given only "as many days before the date of the transfer or discharge as is practicable." 42 U.S.C. § 1396r(c)(2)(B).

### 2. The Rehabilitation Act of 1973

The Rehabilitation Act of 1973 provides as follows, in pertinent part:

> No otherwise qualified individual with handicaps in the United States … shall, solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance …

29 U.S.C. § 794. An "individual with handicaps" includes any person who has, has a record of having, or is regarded as having a physical or mental impairment which substantially limits one or more of his "major life activities." 29 U.S.C. § 706(8). An "otherwise qualified individual" has been interpreted to mean a person "who is able to meet all of a program's requirements in spite of his handicap." *Franklin v. United States Postal Service,* 687 F.Supp. 1214, 1218 (S.D.Ohio 1988).

*Availability of a Private Cause of Action*

### 1. The Medicaid Act

As a general rule, a federal statute does not give rise to a private cause of action unless the statute itself or its legislative history indicates that Congress intended to create such a remedy. *See Stewart v. Bernstein,* 769 F.2d 1088, 1092 (5th Cir.1985). Nothing in 42 U.S.C. § 1396r indicates that Congress intended the legislation to grant individuals a private right of action enforceable against their private nursing homes. Indeed, none of the reported cases construing this provision have held it to permit individuals to maintain actions against private nursing facilities.

Moreover, at least one federal court of appeals specifically has declined to hold

that other portions of the Medicaid Act (42 U.S.C. §§ 1396a-q) provided such a remedy. *Stewart,* 769 F.2d at 1093. Like the portions of § 1396 examined in *Stewart,* 42 U.S.C. § 1396r does provide certain administrative enforcement procedures for violations of its provisions, supporting an inference that no additional private remedy was intended. *See* 42 U.S.C. § 1396r(e)(7), (h).

As the statute is silent on its face as to any private remedy, and as the Court is aware of no other objective indication that Congress intended to create a private cause of action for violations of 42 U.S.C. § 1396r, the Court concludes that Plaintiffs do not possess a federal cause of action thereunder. Accordingly, this Court does not have jurisdiction under 42 U.S.C. § 1396r to grant the preliminary injunctive relief that Plaintiffs request.

### 2. The Rehabilitative Act of 1973

■ Unlike 42 U.S.C. § 1396r, 29 U.S.C. § 794 clearly was intended to create a private right of action. *Smith v. United States Postal Service,* 766 F.2d 205 (6th Cir.1985). Individuals therefore may institute a private cause of action to enforce their rights thereunder. *Pendleton v. Jefferson Local School Dist., Bd. of Educ.,* 754 F.Supp. 570 (S.D.Ohio 1990). Accordingly, this Court has subject matter jurisdiction over Plaintiffs' claims under 29 U.S.C. § 794.

### *Merits of Claims*

### 1. The Medicaid Act

Given this Court's conclusion that 42 U.S.C. § 1396r does not implicitly provide Plaintiffs with a private right of action against Defendants, the Court need not further address Plaintiffs' entitlement to a preliminary injunction on that ground. However, given the possibility that an appellate court might determine that 42 U.S.C. § 1396r does grant a viable private cause of action, the Court also notes that these Plaintiffs would not be entitled to preliminary injunctive relief on that claim in any event.

■ Although Defendants served notice of Plaintiff Nichols' pending discharge only 8 days before the proposed discharge, that notice specified that the discharge was premised upon the danger that Plaintiff Nichols posed to other patients. (*See* Doc. 10, Ex. D). Because safety considerations were involved, Defendants were required to give not 30 days advance notice, but only as much advance notice as was "practicable." The notice was sent in a timely manner, being mailed only 3 days after the March 30 event that precipitated the discharge decision. On its face, then, Defendants' discharge notice appears to conform to 42 U.S.C. § 1396r(c)(2).

Plaintiffs, however, argue that the discharge was not in compliance with the law. They assert that federal regulations permit a nursing facility participating in the Medicaid program to discharge a Medicaid patient for violent behavior only if an appropriate "multi-disciplinary plan of care" previously was instituted, but failed to address the problem. *See* U.S. Dep't. of Health and Human Services State Operations Manual, Provider Certification Transmittal No. 232, at F–193, p. 46. (Doc. 10, Ex. D). Plaintiffs contend that the January 1992 plan of care adopted for Plaintiff Nichols was an appropriate plan that would have prevented the March 30 incident, had Defendants confined Plaintiff Nichols to his room, in accordance with the plan's established procedures. They therefore assert that the discharge was unwarranted.

Plaintiffs may be correct that Defendants could have averted the March 30 incident by following the established plan of care for Plaintiff Nichols. Evidence presented at the hearing suggested that staff members at St. Luke's should have recognized that the tipping of the lift on March 30 aggravated Plaintiff Nichols, making him more likely to become violent. Given that Plaintiff Nichols was just being moved to his wheelchair at that time, Defendants presumably could have denied Plaintiff Nichols access to his wheelchair and/or confined him to his room. That course of action, if successfully completed, might have mitigated the effect of any violent outburst.

But second guessing Defendants' actions on March 30 does not resolve the issue before this Court. However avoidable that particular incident might appear in hindsight, the fact remains that despite the plan of care instituted in January 1992, Plaintiff Nichols remains capable of—and disposed toward—inflicting serious harm to other patients or staff members at Defendants' facility. Although evidence at the hearing indicated that Plaintiff Nichols is likely to become aggressive only when agitated, the multitudinous documents detailing Nichols' behavior problems reveal no predictable pattern as to what may incite such agitation on any given occasion. As Defendants have little basis for predicting when Plaintiff Nichols will become violent, they have little ability to control where he will be when an violent episode occurs.

Defendants' witnesses at the hearing testified that confining Plaintiff Nichols to his room (the first step of the January 1992 plan's procedure) is viable only if Nichols is not already in his motorized wheelchair when his aggressive propensities surface. Once Nichols is positioned in his wheelchair, only he can control its power and direction, and Defendants' staff members would have great difficulty implementing the "step one" confinement. The two subsequent steps in the process—giving Plaintiff Nichols medication to self-administer orally, or injecting him with medication with his permission—both require Nichols' consent. The fact that he declined to cooperate in either step on March 30 underscores the likely failure of these two options when Plaintiff Nichols is behaving irrationally. And the final step in the process—contacting Plaintiff Nichols' physician—is unlikely to produce a sufficiently rapid response to avert the consequences of any violent act.

As the March 30 incident demonstrates, the January 1992 new plan of care on which Plaintiffs rely would not have eliminated Plaintiff Nichols' violent outbursts, but merely outlined management steps to minimize the risk of harm such outbursts presented. Under that plan, Defendants would have remained unable to foresee exactly when or where such outbursts would occur, and would have remained largely at Plaintiff Nichols' mercy to control, by confinement or medication, the impact of such outbursts on other patients and staff. The Court therefore finds that the January 1992 plan of care would not have addressed the safety hazard posed by Plaintiff Nichols' presence in Defendants' facility, and that Plaintiff Nichols' discharge for endangering the safety of others was justified in accordance with 42 U.S.C. § 1396r(c)(2). In light of Defendants' obligation to protect the safety of other residents and staff, the Court does not agree that Defendants should have been compelled to contact the State of Ohio to find an alternative placement rather than summarily discharging Plaintiff Nichols.

In addition, the Court finds that Defendants did provide the services mandated by 42 U.S.C. § 1396r(b)(4)(A). Although Plaintiffs opted to obtain psychiatric and psychological services from practitioners other than those provided by St. Luke's, such services were available throughout Plaintiff Nichols' residency there, and Defendants cooperated fully with the medical personnel Plaintiffs chose. Indeed, the fact that Plaintiffs have petitioned this Court to permit Plaintiff Nichols to remain at St. Luke's rather than seeking placement elsewhere speaks volumes about the perceived quality of the services available there. Plaintiffs thus are not entitled to preliminary injunctive relief based upon 42 U.S.C. § 1396r(b)(4)(A).

### 2. The Rehabilitation Act of 1973

The parties dispute neither Plaintiff Nichols' status as a handicapped person, nor his participation in Defendants' Medicaid program as a protected activity, within the meaning of the Act. Defendants, however, argue that Plaintiffs are not entitled to relief under the Act because Plaintiff Nichols was not denied continued residence at St. Luke "solely by reason of … his handicap." Rather, they claim that Plaintiff Nichols was discharged as a result of his violent behavior, which is separate from his handicap. In addition, they argue that Plaintiff Nichols is not an "otherwise quali-

fied" individual under the Act, as his violent propensities prevent him from participating in St. Luke's Medicaid program within the constraints necessitated by the facility's operations.

■ The evidence presented at the hearing on Plaintiffs' motion indicates that the impulse control problems underlying Plaintiff Nichols' violent episodes are a function of the brain damage he sustained, and thus could be considered an unavoidable product of his handicap. Those administering federally-funded programs are required to make reasonable accommodations to handicapped persons eligible to participate in such programs. *See James v. Frank*, 772 F.Supp. 984 (S.D.Ohio 1991). However, accommodations that would impose an undue hardship on the party receiving federal funds are not reasonable, and are not required by 29 U.S.C. § 794. *See Hall v. United States Postal Service*, 857 F.2d 1073 (6th Cir.1988).

■ The Court accepts Defendants' judgment, as supported by the evidence, that Plaintiff Nichols' impulse control problems cannot be reasonably accommodated in the St. Luke's Center setting. The unpredictability of Nichols' outbursts, Defendants' lack of control over Nichols' movements, and the presence of numerous elderly patients who suffer from various physical and mental infirmities combine to create a situation in which Defendants cannot assure the safety of any patients in Plaintiff Nichols' immediate vicinity. If an individual's handicap cannot be accommodated in a way that assures a safe environment when he participates in a program, the program provider is justified in excluding him from participation. *See Pesterfield v. Tennessee Valley Authority*, 941 F.2d 437 (6th Cir. 1991). As Defendants cannot reasonably accommodate Plaintiff Nichols' aggression in the St. Luke's Center facility, his discharge does not violate 29 U.S.C. § 794.

### Conclusions of Law

1) The Medicaid Act does not confer a private right of action whereby individual Medicaid recipients can proceed against a private nursing care facility for failure to provide mandated services or for improper discharge. 42 U.S.C. § 1396r(b)(4)(A)(i)–(vii); *see Stewart v. Bernstein*, 769 F.2d 1088, 1093 (5th Cir.1985).

2) Plaintiff Nichols' propensity toward aggressive behavior endangered the safety of other individuals in the nursing care facility, justifying his permanent discharge under 42 U.S.C. § 1396r(c)(2)(A)(iii).

3) Under the circumstances leading to Plaintiff Nichols' discharge, Defendants were not required to provide 30 days advance notice. 42 U.S.C. § 1396r(c)(2)(B)(ii).

4) Defendants substantially complied with the provisions of 42 U.S.C. § 1396r(b)(4)(A).

5) Defendants cannot reasonably accommodate the violent behavior manifestations of Plaintiff Nichols' handicap in the St. Luke's Center setting. *Hall v. United States Postal Service*, 857 F.2d 1073 (6th Cir.1988); *Pesterfield v. Tennessee Valley Authority*, 941 F.2d 437 (6th Cir.1991).

6) Because Plaintiffs have failed to demonstrate that they are likely to prevail on the merits of their claims against Defendants, they are not entitled to preliminary injunctive relief. *Southern Milk Sales, Inc. v. Martin*, 924 F.2d 98, 102–03 (6th Cir.1991).

IT THEREFORE IS ORDERED that Plaintiffs' motion for a temporary restraining order and preliminary injunctive relief (Doc. 2), and Plaintiffs' motion and reply memorandum in support of preliminary injunctive relief (Doc. 11) hereby are DENIED.

Pursuant to Fed.R.Civ.P. 65(a)(2), it further is ORDERED that the trial of this action on the merits hereby is advanced and consolidated with the hearing of Plaintiffs' motion for preliminary injunction, that all forms of injunctive relief requested in Plaintiffs' complaint (Doc. 1) hereby are DENIED, and that Plaintiffs' complaint hereby is DISMISSED with prejudice.

IT IS SO ORDERED.