**Patricia A. KOHL, Plaintiff,**

v.

**AMERICAN HOME PRODUCTS CORP., Wyeth–Ayerst Laboratories Division of American Home Products Corporation, A.H. Robins Co., Inc., Sims Drug, Inc., and Clinic Pharmacy, Defendants.**

**No. Civ. 99–3085.**

United States District Court, W.D. Arkansas, Harrison Division.

Dec. 29, 1999.

Don R. Elliott, Jr., Bobby Lee Odom, Russell B. Winburn, Jennifer Wheeler Haskins, Odom Elliott & Martin, Fayetteville, AR, George H. Niblock, Niblock Law Firm, Fayetteville, AR, Pamela Talley Parker, Bentonville, AR, for Plaintiff.

Lyn Peeples, Pruitt Mitchell, Williams, Selig, Gates & Woodyward, Little Rock,

AR, Tim Atkeson, David M. Orta Arnold & Porter, Washington, DC, for American Home & Wyeth.

John E. Moore, Huckabay, Munson, Rowlett & Tilley, Little Rock, AR, for Sims Drug.

Donald H. Bacon, Friday, Eldredge & Clark, Little Rock, AR, for Clinic Pharmacy.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Senior District Judge.

This case is currently before the court on the plaintiff's motion to remand and the defendants' motion to stay.

### Background.

Plaintiff filed this action in the Circuit Court of Marion County, Arkansas, on October 8, 1999. The plaintiff, Patricia Ann Kohl, alleges she contracted valvular heart disease, including mitral and tricuspid valve regurgitation and aortic valve disease, as a result of taking diet drugs prescribed by Dr. Stevan VanOre beginning in approximately May of 1996. Specifically, Kohl took the prescription diet drugs Dexfenfluramine and Fenfluramine. Kohl also took the drug Phentermine.

The combination use of these drugs is popularly referred to as the Fen/Phen diet. Defendants American Home Products, Corp. (AHP), Wyeth–Ayerst Laboratories and A.H. Robins (Robins) are pharmaceutical companies who have been regularly engaged in the business of manufacturing, marketing, selling and/or distributing Dexfenfluramine and Fenfluramine. Sims Drug and Clinic Pharmacy are sellers or distributors of Dexfenfluramine and Fenfluramine. The complaint asserts negligence and strict liability causes of action.

On November 16, 1999, defendants removed the case pursuant to 28 U.S.C. §§ 1332 and 1441. In their notice of removal, defendants contend diversity of citizenship exists between the plaintiff and the properly named defendants, AHP, Wyeth–Ayerst, and Robins. They contend Sims Drug and Clinic Pharmacy, both citizens of Arkansas, were fraudulently joined for the purpose of preventing removal of the action from state to federal court.

On December 2, 1999, defendants submitted this case as a potential "tag-along action" to the Judicial Panel on Multi-District Litigation ("JPML"). Defendants seek the transfer of this case to the Eastern District of Pennsylvania for consolidated pretrial proceedings before Senior Judge Bechtle as part of MDL–1203, *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Products Liability Litigation.* On December 14, 1999, a conditional transfer order was entered by the JPML.

On November 24, 1999, plaintiff filed a motion to remand the case to the Circuit Court of Marion County, Arkansas, on the ground that this court lacks subject matter jurisdiction because diversity of citizenship is lacking. On December 8, 1999, defendants filed a motion to stay the proceedings pending the transfer of the case to multi-district litigation ("MDL"). In case the court denies their request for a stay, defendants also responded to the motion to remand.

### Discussion.

#### I. Motion to Stay.

Defendants request that the court stay all proceedings pending the transfer of this case to MDL. Defendants inform the court that this is one of more than 1400 pending federal cases involving the prescription drugs Phentermine, Fenfluramine, and Dexfenfluramine, and that, since December of 1997, the JPML has been transferring these cases to the consolidated action.

Defendants suggest the stay is dictated by principles of economy and consistency. Defendants contend the JPML has encouraged the transfer of remand motions to the MDL. They point out many transferor district courts have stayed remand motions pending transfer. They contend a post-transfer ruling promotes economy by ensuring that only one federal judge will have to determine jurisdictional issues for

hundreds of related cases with related or identical issues. In their view, a post-transfer ruling promotes consistency by ensuring that the jurisdictional and substantive legal issues are interpreted once and applied consistently in all the MDL cases from Arkansas and other jurisdictions.

■ The court has addressed this same issue in two unpublished opinions. *See Baker v. Wyeth–Ayerst Labs. Div., et al.,* Civil No. 98–5126 (Aug. 6 1998) and *Brightwell v. A.H. Robins Co., Inc., et al.,* Civil No. 99–5061 (June 2, 1999). In those cases, this court recognized that a motion to transfer a case to MDL does not automatically stay discovery, postpone rulings on pending motions, or generally suspend further proceedings in the court in which the action was filed. *See Rule 1.5 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation. See also Tortola Restaurants, L.P. v. Kimberly–Clark Corp.,* 987 F.Supp. 1186, 1188–89 (N.D.Cal. 1997).

■ In deciding whether to stay rulings, the court considers, among other things, whether the issues in question are easily capable of arising in multiple cases, whether the issues involve common questions of law and fact which relate to the cases already transferred to MDL, and whether it would serve judicial economy to have the questions resolved by a single court.

In this case, the court believes the best course is to decide the motion to remand because "[j]udicial economy will be best served by addressing the remand issue [as it] will facilitate litigation in the appropriate forum." *Tortola,* 987 F.Supp. at 1189 (internal quotation marks and citation omitted). The issues raised in the motion to remand turn on an interpretation of state law. As such, uniformity in the handling of the diet drug cases will not be compromised by deciding a unique question wholly dependent on the law of the State of Arkansas. We also note that at least one court has held that it cannot stay proceedings in an action over which it lacks jurisdiction. *Lloyd v. Cabell Hunt-*

*ington Hospital, Inc.,* 58 F.Supp.2d 694, 696 (S.D.W.Va.1999).

While we believe the prudent course is to decide the motion to remand, we agree with defendants that any further proceedings should be stayed given the entry of the conditional order of transfer. Simultaneously with the entry of the order denying the motion to remand, we will grant defendants' motion to stay all further proceedings.

## II. Motion to Remand.

Plaintiff contends the removal was improper because complete diversity does not exist. Specifically, she points out that she is a citizen of Arkansas as are two of the named defendants, Sims Drug and Clinic Pharmacy. Defendants assert, however, that the two Arkansas defendants were fraudulently joined.

### (a). Right to Removal in General.

A defendant may remove any action over which a federal court could have exercised original jurisdiction. The removal statute provides as follows:

> Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant
>
> . . . .

28 U.S.C. § 1441(a). Since this action is predicated on state law, original jurisdiction exists in this court only if there is complete diversity between the plaintiff and defendants and if the amount in controversy exceeds $75,000. 28 U.S.C. § 1332.

In addition to the complete diversity requirement of 28 U.S.C. § 1332, the removal statute further provides that diversity cases "shall be removable only if none of the parties in interest *properly* joined and served as defendants is a citizen of the State in which such action is brought." 28 U.S.C. § 1441(b) (emphasis added). It

would therefore appear that this action is not removable for two reasons. First, there is a lack of complete diversity between plaintiff and defendants, since plaintiff is a citizen of Arkansas and defendants Sims Drug and Clinic Pharmacy are also citizens of Arkansas. Second, as two defendants are citizens of Arkansas, the state in which the action was brought, § 1441(b) bars removal. However, this initial analysis of the complaint does not end the inquiry, since defendants contend that Sims Drug and Clinic Pharmacy, the defendants whose presence in the case defeats diversity, are not properly named as parties.

### (b). General Principles of Fraudulent Joinder.

If the joinder of Sims Drug and Clinic Pharmacy was fraudulent, they will be dismissed and their joinder will not defeat removal. "Joinder designed solely to deprive federal courts of jurisdiction is fraudulent and will not prevent removal." *Anderson v. Home Ins. Co.*, 724 F.2d 82, 84 (8th Cir.1983) (*citing Tedder v. F.M.C. Corp.*, 590 F.2d 115, 117 (5th Cir.1979)). The doctrine of fraudulent joinder is designed to prevent plaintiffs from naming parties of the same citizenship merely to avoid removal of an action to federal court.

A party will be considered fraudulently joined when plaintiff has not stated a claim for relief or does not intend to secure a judgment against the defendant. 14B Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3723 at 577 (3d ed.1998). But there need only be a possibility that a right to relief exists under the law to avoid this conclusion, and all ambiguities in state law are to be resolved in favor of plaintiff. *Barnes v. Southwestern Bell Telephone Co.*, 596 F.Supp. 1046 (W.D.Ark.1984).

### (c). Applying the Rules to This Case.

As stated above, plaintiff's causes of action are for: (1) negligence; and (2) strict liability. Kohl contends both are valid causes of action against the resident defendants, rendering removal improper.

### (1). Negligence Claim Against Defendant Pharmacies.

The main thrust of Kohl's negligence claim is that the defendant pharmacies had a duty to advise her of known side-effects of the drugs before selling them to her. Additionally, she alleges the defendant pharmacies were negligent in labeling the drugs and in passing on information supplied by the drug manufacturers.

To support her claims, she relies in part on Ark.Code Ann. § 17–92–101(14)(A)(viii) which defines the practice of pharmacy to include "[a]dvising and providing information concerning utilization of drugs and devices and participation in drug utilization reviews." Ark.Code Ann. § 17–92–101(14)(A)(viii) (Supp.1999). She also cites the court to various cases from other jurisdictions in which the courts have held that valid negligence claims against a pharmacy or a pharmacist have been stated. She cites *Horner v. Spalitto*, 1 S.W.3d 519 (Mo.Ct.App.1999), *Hand v. Krakowski*, 89 A.D.2d 650, 453 N.Y.S.2d 121 (N.Y.App. Div.1982), *Riff v. Morgan Pharmacy*, 353 Pa.Super. 21, 508 A.2d 1247, 1251 (1986), *appeal denied*, 514 Pa. 648, 524 A.2d 494 (1987), *Dooley v. Everett*, 805 S.W.2d 380 (Tenn. Ct. App.1990), and *Lasley v. Shrake's Country Club Pharmacy, Inc.*, 179 Ariz. 583, 880 P.2d 1129 (1994).

In opposition, the defendant drug manufacturers argue that no cause of action may be maintained under Arkansas law against a retail pharmacy for filling a physician's prescription. They contend no Arkansas court has ever recognized a cause of action against a pharmacy for breaching a duty to warn the patient of the general risks associated with a medication prescribed by a physician. On this basis, they argue Sims Drug and Clinic Pharmacy were fraudulently joined to defeat diversity jurisdiction.

The issue of whether a cause of action may be maintained against a retail pharmacy for filling a physician's prescription has been the subject of debate in both the case law and in the academic field. *See*

*generally* Lauren Fleischer, *From Pill-counting to Patient Care: Pharmacists' Standard of Care in Negligence Law,* 68 Fordham L.Rev. 165 (Oct.1999). Traditionally the pharmacist's duty was limited to that of technical accuracy in the filling of the prescription. *Id.* at 168. This view was based on the desire to avoid interference with the physician-patient relationship and on the fact that the pharmacist was not viewed as exercising independent discretion, skill, or knowledge.

More recently, some courts have moved away from strict adherence to this traditional view, recognizing the expanded role pharmacists take in healthcare. It has been recognized that "pharmacists play a vital role in determining the success or failure of drugs." *Id.* at 169.

As the pharmacist and the practice of pharmacy gain recognition as a vital part of the healthcare system, the courts have had to juxtapose the view of a pharmacist as a technician charged merely with properly filling prescriptions with the view of a pharmacist exercising professional judgment independent of the prescribing physician in screening prescriptions, etc. These courts are faced with the question of whether a legal standard requiring more than clerical accuracy is appropriate.

Some courts have found no basis for liability where there is no allegation that the pharmacist altered the product, or dispensed the wrong drug, or knowingly dispensed a drug that was inferior or defective, or had additional information about the plaintiff's condition from which a trier of fact could conclude a duty to warn existed and/or a duty to inquire of the prescribing physician whether such drugs were appropriate. *See e.g., Negrin v. Alza Corporation,* 1999 WL 144507 (S.D.N.Y.1999) (No liability under New York law where complaint is devoid of any allegations that the pharmacist did anything other than correctly fill a prescription and dispense the product as packaged by defendant manufacturers.). *See also Aucoin v. Vicknair,* 1997 WL 539889, *3 (E.D.La.1997) (Under Louisiana law " '[a] pharmacist has

a duty to fill a prescription correctly and to warn the patient or to notify the prescribing physician of an excessive dosage or of obvious inadequacies on the face of the prescription which create a substantial risk of harm to the patient.' ").

Courts appear to have been cautious in placing a duty to warn of potential side effects on a pharmacy because such a duty would interfere with the physician-patient relationship. For instance, in *Walker v. Jack Eckerd Corp.,* 209 Ga.App. 517, 434 S.E.2d 63 (1993) the court stated:

> However, in view of ... the need for preserving, without interference of third parties, a trusted physician patient relationship, the fact that patients have different reactions to and tolerances for drugs coupled with the fact that the severity of a patient's condition may warrant a different level of risk acceptance, which factors are best monitored and evaluated by doctors, and the public policy of this state for reducing frivolous malpractice actions against professionals, we find more persuasive and adopt the rule as announced in *Jones v. Irvin,* 602 F.Supp. 399, 402–403(7) (D.S.D.Ill. 1985), to-wit: "A pharmacist ... owes the customer the 'highest degree of prudence, thoughtfulness, and diligence.' " However, "a pharmacist has no duty to warn the customer or notify the physician that the drug is being prescribed in dangerous amounts, that the customer is being over medicated, or that the various drugs in their prescribed quantities could cause adverse reactions to the customer. It is the duty of the prescribing physician to know the characteristics of the drug he is prescribing, to know how much of the drug he can give his patient, to elicit from the patient what other drugs the patient is taking, to properly prescribe various combinations of drugs, to warn the patient of any dangers associated with taking the drug, to monitor the patient's dependence on the drug, and to tell the patient when and how to take the drug. Further, it is the duty of

the patient to notify the physician of the other drugs the patient is taking. Finally, it is the duty of the drug manufacturer to notify the physician of any adverse effects or other precautions that must be taken in administering the drug. Placing these duties to warn on the pharmacist would only serve to compel the pharmacist to second guess every prescription a doctor orders in an attempt to escape liability." *Id.* at 402.

*Walker,* 434 S.E.2d at 67–68 (internal citations omitted).

Yet there appears to be an increasing recognition that pharmacists are trained professionals and the courts have concluded that, in some cases, the pharmacist's duty will extend beyond merely accurately filling a prescription. *Horner v. Spalitto,* 1 S.W.3d 519 (Mo.Ct.App.1999); *Lasley v. Shrake's Country Club Pharmacy Inc.,* 179 Ariz. 583, 880 P.2d 1129 (1994); *Dooley v. Everett,* 805 S.W.2d 380 (Tenn. Ct. App.1990). These courts reject the argument that a "pharmacy is no more than a warehouse for drugs and that a pharmacist has no more responsibility than a shipping clerk who must dutifully and unquestionably obey the written orders or omniscient physicians." *Riff v. Morgan Pharmacy,* 353 Pa.Super. 21, 508 A.2d 1247 (1986). In such cases, the pharmacist's duty is to exercise the care and prudence that a reasonably careful and prudent pharmacist would exercise in the same or similar circumstances. *Horner v. Spalitto,* 1 S.W.3d 519 (Mo.Ct.App.1999). *See also Dooley v. Everett,* 805 S.W.2d 380, 385 (Tenn. Ct. App.1990) ("The pharmacist is a professional who has a duty to his customer to exercise the standard of care required by the pharmacy profession in the same or similar communities as the community in which he practices his profession.").

The Arkansas courts "have not yet considered the issue of whether the scope of a pharmacist's duty of reasonable care includes an obligation to warn customers of possible adverse effects of prescribed medications." *Lasley v. Shrake's Country Club Pharmacy, Inc.,* 179 Ariz. 583, 880 P.2d 1129, 1132 (1994). However, some guidance can be gleaned from Arkansas statutory law.

In Arkansas, the practice of pharmacology is a regulated profession. The term "pharmacy care" is defined to mean "the process by which a pharmacist in consultation with the prescribing practitioner identifies, resolves, and prevents potential and actual drug-related problems and optimizes patient therapy outcomes through the responsible provision of drug therapy or disease state management...." Ark.Code Ann. § 17–92–101(11) (Supp.1999).

The "practice of pharmacy" means the learned profession of:

[i]nterpreting prescriptions for drugs, medicines, poisons, or chemicals issued by practitioners authorized by law to prescribe drugs, medicines, poisons, or chemicals which may be sold or dispensed only on prescription ...

[a]dvising and providing information concerning utilization of drugs and devices and participation in drug utilization reviews ...

[p]roviding pharmacy care ...

Ark.Code Ann. § 17–92–101(14)(A)(v), (viii), (x) (Supp.1999).

The Arkansas Medical Malpractice Act defines an "action for medical injury" as "a action against a medical care provider, whether based in tort, contract, or otherwise, to recover damages on account of medical injury." Ark.Code Ann. § 16–114–201(1) (1987). The term "medical care provider" is defined to include a pharmacist. Ark.Code Ann. § 16–114–201(2). The term " 'medical injury' means any adverse consequences arising out of or sustained in the course of the professional services being rendered by a medical care provider, whether resulting from negligence, error, or omission in the performance of such services." Ark.Code Ann. § 16–114–201(3).

Kohl's complaint beginning in ¶ 17 purports to assert a negligence claim against the defendant pharmacies. Kohl alleges that when the defendant pharmacies sold

her the diet drugs, the pharmacies knew or should have known, among other things, the following: (1) The FDA had not approved the use of the drugs in combination for weight loss; (2) Dexfenfluramine/Fenfluramine, when used individually, carried the risk of serious side effects, including primary pulmonary hypertension, serious heart conditions, cerebral hemorrhage, cerebral infarction, and bacterial endocarditis; (3) Dexfenfluramine/Fenfluramine when used as part of the Fen/Phen diet also created the risk of valvular heart disease; (4) once they stopped taking the drugs, most users regained any weight they had lost; (5) there had been insufficient studies regarding the safety and efficacy of the Fen/Phen combination; and (6) for years, respected experts, commissions and medical associations had stated that these diet pills and chemically similar diet pills were suspected to cause serious health conditions and could no longer be justified.

Based on this knowledge, Kohl alleges the pharmacy defendants had a duty to advise her of the various risks and benefits associated with the use of Dexfenfluramine/Fenfluramine and Phentermine and had a duty to advise her regarding contraindications and known complications associated with the use of these drugs. Kohl alleges the pharmacy defendants violated the standard of care in one or more of the following ways: (1) failing to tell her that other physicians, experts, and medical associations familiar with the use of these diet pills have felt that the known and suspected risks outweigh the reported benefits; (2) failing to warn her that the side effects included life threatening conditions such as primary pulmonary hypertension, cerebral hemorrhage, myocardial and cerebral infarctions, heart valve damage/disease, and others; (3) failing to advise her that the *Physician's Desk Reference* stated that even though studies indicated that people on the drugs sometimes noted weight loss, the "studies did not permit conclusions as to the relative importance of drug and non-drug factors on weight loss" including the quality of physician-investi-

gator and the population studied; (4) failing to advise her that any weight loss was likely to be temporary; (5) failing to advise her that the Fen/Phen combination was not FDA approved; (6) failing to advise her that the drugs were approved only for a short term use; (7) failing to supply Kohl or Dr. VanOre with appropriate labeling information supplied by the manufacturer; and (8) failing to question the defendant manufacturers about the reliability and accuracy of labeling information provided by those companies and being provided to consumers and doctors in spite of the fact that the pharmacies knew, or in the exercise of reasonable care, should have know that the labeling information was inaccurate.

■ Given the statutory provisions discussed above, we disagree with the defendant manufacturers' assessment of Arkansas law and believe a cause of action against the pharmacies is cognizable. At this point, the sole question we are considering is whether the pharmacy defendants have been fraudulently joined. To avoid the conclusion that they were fraudulently joined, there need only be a possibility that a right to relief exists under the law and all ambiguities in state law are to be resolved in favor of plaintiff. When faced with the issue, we believe Arkansas courts would hold that a pharmacy has a legal duty to exercise due care and diligence in the performance of its professional duties.

■ However, we do not believe this duty encompasses a general duty to warn customers of potential drug side effects or to give advice on the efficacy of the drug absent the presence of some contraindication. *But see Docken v. Ciba–Geigy,* 86 Or.App. 277, 739 P.2d 591 (1987) (Recognizing the validity of a claim against a pharmacist for negligent failure to warn without reference to the learned intermediary doctrine). In *Coyle v. Richardson–Merrell, Inc.,* 526 Pa. 208, 584 A.2d 1383 (1991), the court rejected the argument that pharmacists have an independent duty to warn of allegedly dangerous char-

acteristics of prescription drugs they dispense noting that its rule was that:

information about the risks of medicines is provided to the person who most needs and can best evaluate it—the physician—to be shared with and explained to the patient in the context of his or her individual medical circumstances. If the manufacturer has no duty to directly warn patients of the risk of drugs, it would indeed be incongruous to hold pharmacists to such a duty in the dispensing of drugs.

Unlike the marketing system for most other products, the distribution system for prescription drugs is highly restricted. Pharmacists, as suppliers, do not freely choose which "products" they will make available to consumers in any given instance, and patients, as consumers, do not freely choose which "product" to buy. Physicians exercising sound medical judgment act as intermediaries in the chain of distribution, preempting, as it were, the exercise of discretion by the supplier-pharmacist, and, within limits, by the patient-consumer. With regard to the communication of warnings, we have recognized this as a real distinction that requires a different rule.

To fully serve its purpose this rule must carry through to the pharmacist as well. Otherwise, the patient-consumer would be receiving information about the risks of medication, information he or she would likely be unable to properly assess and weigh, from someone unfamiliar with the patient's medical condition, after those risks had already been weighed by a physician having specific knowledge of the patient's medical needs. While the patient is entitled to know, and a doctor has a duty to inform the patient, of any dangers or side effects associated with a drug recommended for treatment, we see no sound reason for imposing on pharmacists the duty to supply information about the risks of drugs that have already been prescribed. On the contrary, such a rule would have the effect of undermining the physician-patient relationship by

engendering fear, doubt, and second-guessing.

*Id.* at 1386. *See also West v. Searle & Co.,* 305 Ark. 33, 806 S.W.2d 608 (1991) (A drug manufacturer may rely on the learned intermediary exception to the general duty of a manufacturer to warn the ultimate user of the risk of its product).

■ Under this rule, the drug manufacturer may rely on the prescribing physician to warn the ultimate user of the risk of a prescription drug. We therefore agree with defendants that pharmacies generally have no common-law or statutory duty to warn customers of the risks associated with the prescription drugs they purchase. There may, of course, be exceptions to this general rule such as where there is evidence the pharmacy compounded the drug or changed the drug in some manner after receiving it from the manufacturer. No such allegations have been made in this case.

■ While a generalized duty to warn is inappropriate given the role of the physician in determining the appropriate drug to be prescribed, we believe the pharmacy must be held to a duty to fill prescriptions as prescribed and properly label the prescriptions. The allegations of Kohl's complaint include the allegation that the pharmacies failed to supply Kohl and/or her doctor with appropriate labeling information supplied by the manufacturer and the allegation that the pharmacies knew, or should have known, that the labeling information that was supplied was inaccurate. Given these allegations, we cannot say that there is no possibility a right to relief exists under Arkansas law.

As the *Riff* court noted:

[a] pharmacist is a professional. In the performance of his professional duties he will be held to the standard of care, skill, intelligence which ordinarily characterizes the profession. Public policy requires that pharmacists who prepare and dispense drugs and medicines for use in the human body must be held

responsible for the failure to exercise the degree of care and vigilance commensurate with the harm likely to result from relaxing it.

*Riff,* 508 A.2d at 1251.

### (2). Strict Liability Claim Against Defendant Pharmacies.

The manufacturer defendants next argue that plaintiff's strict liability claims are not cognizable because the pharmacy defendants are service providers and not suppliers of a product. In support, defendants rely on *Kirkendall v. Harbor Ins. Co.,* 887 F.2d 857, 859 (8th Cir.1989) and the characterization of the Arkansas legislature of pharmacies and pharmacists as providers of professional services, Ark. Code Ann. §§ 16–114–201(1); 17–92–101(14)(A); 17–92–101(14)(C)(i); 17–92–316; 17–92–403(e); 17–92–403(f).

*Kirkendall,* a case arising out of this court, held that the supplying of blood for transfusions was a service rather than a product for purposes of the Arkansas Product Liability Act of 1979, Ark.Code Ann. § 16–116–101 *et seq.* This ruling was premised primarily on Arkansas' explicit statutory prohibition of the imposition of legal liability without fault upon persons engaged in the transfer of blood. Ark. Code Ann. §§ 20–9–801 to 802. We therefore believe it has limited application to this case.

To state a claim for strict liability under Arkansas law, plaintiff must prove that: (1) the defendant pharmacies are engaged in the business of selling a product; (2) the product was supplied in a defective condition which rendered it unreasonably dangerous; and (3) the defective condition was a proximate cause of the harm. Ark.Code Ann. § 4–86–102(a) (Repl.1996); *Williams v. Smart Chevrolet Co.,* 292 Ark. 376, 730 S.W.2d 479 (1987). "Generally speaking, there are three varieties of product defects: manufacturing defects, design defects, and inadequate warnings." *West v. Searle & Co.,* 305 Ark. 33, 37, 806 S.W.2d 608 (1991).

The term "product" means "any tangible object or goods produced." Ark.Code Ann. § 16–116–102(2) (1987). The term "supplier" means "any individual or entity engaged in the business of selling a product, whether the sale is for resale, or for use or consumption." Ark.Code Ann. § 16–116–102(3).

Some courts have held that pharmacies cannot be held strictly liable for dispensing a prescription drug. This conclusion is typically reached in one of two ways. First, some courts rely on the learned intermediary doctrine to reject the application of strict liability to pharmacies or pharmacists. *See e.g., Raynor v. Richardson–Merrell, Inc.,* 643 F.Supp. 238, 246–47 (D.D.C.1986) (Invoking the learned intermediary doctrine, pharmacist is not strictly liable under a products liability theory); *Griffith v. Blatt,* 158 Or.App. 204, 973 P.2d 385 (1999), *review denied,* 329 Or. 287, —— P.2d ——, (1999) (Pharmacist was not required, under learned intermediary doctrine, to warn patient about proper use of prescription lotion or dangers of its overuse, thereby barring patient's strict liability claim against pharmacist). Other courts follow the path suggested by the manufacturer defendants and draw a distinction between service providers and providers of products. *See e.g., Murphy v. E.R. Squibb & Sons, Inc.,* 40 Cal.3d 672, 221 Cal.Rptr. 447, 710 P.2d 247 (1985) (refusing to hold pharmacists liable under the strict product liability doctrine because "the pharmacist is engaged in a hybrid enterprise, combining the performance of services and the sale of prescription drugs"); *Zichichi v. Middlesex Mem. Hosp.,* 204 Conn. 399, 528 A.2d 805, 807 (1987) (Service providers are not held strictly liable in tort for product liability claims).

The case of *Coyle v. Richardson–Merrell, Inc.,* 526 Pa. 208, 584 A.2d 1383 (1991) is exemplary of the cases relying on the learned intermediary doctrine. There, the Pennsylvania Supreme Court addressed the question of "whether a pharmacy should be subject to liability as a supplier in accordance with the principle of strict

liability found in Restatement (Second) of Torts § 402A." *Id.* at 1384. It noted that under its case law, when a drug is available only upon prescription by a duly licensed physician the warning required is not to the general public or the patient but to the prescribing doctor. *Id.* at 1385. The court formulated this "rule with reference to comment k [of § 402A of the Restatement (Second) of Torts] and the policies expressed therein." *Id.*

The court then examined four factors which support the rule of strict product liability: "(1) supplier liability makes a member of the marketing chain available to the injured plaintiff for redress; (2) strict liability provides an incentive to safety; (3) a supplier is in a better position to prevent the circulation of the defective products; and (4) the supplier can distribute the cost of compensating for injuries resulting from defects by charging for it in his business." *Id.* at 1387.

Applying these factors to a pharmacist's role as supplier in prescription drug transactions, the court concluded that:

> in the restricted distribution system of prescription drugs, it is not the pharmacist on whom the public "is forced to rely" to obtain the products they need. Physicians act as exclusive intermediaries. Nor could holding pharmacists to strict liability serve as an incentive to safety, for the pharmacist presented with a prescription ordered by a duly licensed physician is not at liberty to substitute his judgment of the product's safety for the patient for that of the physician. Similarly, as to preventing the circulation of defective products, it would ill-serve the needs of the public to impose a duty on pharmacists under which, to avoid potential liability, they might refuse to fill prescriptions, notwithstanding decisions by licensed physicians that a particular drug was necessary and appropriate for their patients' medical treatment.
>
> In support of their argument, the appellants can assert no more than the pharmacists' ability to obtain insurance and/or indemnification as a means of distributing the potential cost of liability. Reliance on cost-shifting as the only factor to be considered in whether a given party should be exposed to liability, however, would result in absolute liability rather than strict liability.
>
> For the reasons stated, we decline to extend the rule of strict supplier liability to pharmacists.

*Id.* at 1387. *See also Ramirez v. Richardson–Merrell, Inc.,* 628 F.Supp. 85, 87–88 (E.D.Pa.1986) (It would be illogical and unreasonable to impose a greater duty on the pharmacist than that imposed on the manufacturer); *Leesley v. West,* 165 Ill. App.3d 135, 116 Ill.Dec. 136, 518 N.E.2d 758, 762 (1988), *appeal den.,* 119 Ill.2d 558, 119 Ill.Dec. 387, 522 N.E.2d 1246 (1988) (same); *Bichler v. Willing,* 58 A.D.2d 331, 397 N.Y.S.2d 57 (1977) (retail druggists dispensing prescription drugs were not liable under strict products liability citing Comment k, Restatement (Second) Torts § 402A). *But see Heredia v. Johnson,* 827 F.Supp. 1522, 1525 (D.Nev.1993) ("This Court cannot find that the Nevada Supreme Court would hold that the strict liability doctrine does not apply to Defendant [pharmacy] simply because the subject transaction was a sale by defendant of a prescription drug.").

While the manufacturer defendants devote much of their argument to the contention that the pharmacy defendants cannot be held strictly liable because they provide a service rather than a product, we find this distinction rather shaky in the pharmacy context. It is true that a licensed pharmacist dispenses prescription drugs. We also agree with defendants that the applicable Arkansas statutes treat both pharmacies and pharmacists as service providers. However, the service is not separately billed from the product and provision or distribution of the prescription drugs, *i.e.,* the product, is the main function of the pharmacy.

■ Whether a pharmacist is regarded as providing a service or a product, we

believe the sound policy reasons supporting application of the learned intermediary doctrine precludes holding pharmacists or pharmacies strictly liable to consumers who purchase prescription drugs. We find the reasoning of the cases discussed above persuasive and consistent with Arkansas' endorsement of the "learned intermediary doctrine." *West,* 305 Ark. at 39–44, 806 S.W.2d 608. Accordingly, with respect to the strict liability claim, we find the claim against the pharmacy defendants is not cognizable.

### (3). Statute of Limitations Defense.

Assuming any cause of action is cognizable under Arkansas law, the manufacturer defendants argue the claims, regardless of how pled, are barred by the two year Arkansas Medical Malpractice statute of limitations. Ark.Code Ann. § 16–114–203(a) (Supp.1999). As the claims are time barred, the manufacturer defendants contend the pharmacy defendants were fraudulently joined.

Under § 16–114–201(a), "[a]ll actions for medical injury shall be commenced within two (2) years after the cause of action accrues." Ark.Code Ann. § 16–114–203(a) (Supp.1999). An "action for medical injury" means "any action against a medical care provider, whether based in tort, contract, or otherwise, to recover damages on account of medical injury." Ark.Code Ann. § 16–114–201(1) (1987). The term "medical care provider" is defined to include a pharmacist. Ark.Code Ann. § 16–114–201(2) (1987). The date of accrual "shall be the date of the wrongful act complained of and no other time." Ark. Code Ann. § 16–114–203(b) (Supp.1999).

Kohl urges application of one of two three year statutes of limitation: The first, is the Product Liability Act's limitation period found in Ark.Code Ann. § 16–116–103 (1987); The second is the limitation period for tort actions found in Ark.Code Ann. § 16–56–105 (1987).

Kohl contends pharmacies are not medical care providers within the meaning of the Medical Malpractice Act. As the medical malpractice limitation period only applies to actions against medical care providers, she contends the limitation period is inapplicable.

As she correctly points out, the Act's definition of the term "medical care provider" lists pharmacists but does not list pharmacies. Relying on the general rule of statutory construction, *expressio unius est exclusio alterious,* the expressed designation of one thing may properly be construed to mean the exclusion of another, Kohl contends pharmacies are not "medical care providers" within the meaning of the Act. Kohl points out the definition of medical care provider includes other entities where medical care providers may work, *e.g.,* hospitals, nursing homes, community health center, etc.

■ Notwithstanding the concept of *expressio unius est exclusio alterious,* we believe a pharmacy is a medical care provider within the meaning of the Arkansas Medical Malpractice Act. Under Arkansas' Medical Professional provisions dealing with pharmacists and pharmacies, the term "pharmacy" is defined to mean "the place licensed by the board in which drugs, chemicals, medicines, prescriptions, and poisons are compounded, dispensed, or sold at retail." Ark.Code Ann. § 17–92–101(10) (Supp.1999). Under Arkansas law, it is unlawful for a person who is not a licensed pharmacist to conduct a pharmacy or drugstore business unless he keeps constantly in the store a licensed pharmacist. Ark.Code Ann. § 17–92–402 (1987). With exceptions not relevant here, no person can perform any of the acts constituting the practice of pharmacy unless the person is a licensed pharmacist. Ark.Code Ann. § 17–92–301(a) (Supp.1999).

As the manufacturer defendants correctly point out, a pharmacy provides professional medical services, namely dispensing prescription medication, solely through a pharmacist. When the pharmacist goes home for the night, no one else at the pharmacy can provide any services related to the care of patients. In contrast, other

entities such as hospitals continue to provide patient care through numerous individuals whose titles are not listed in the definition of "medical care provider" other than as "an officer, employee or agent thereof." Ark.Code Ann. § 16–114–201(2). Thus, we believe the reference in the Medical Malpractice Act to a "pharmacist" should be deemed to include a pharmacy.

Having concluded a pharmacy is a medical care provider within the meaning of the Arkansas Medical Malpractice Act, we turn to the question of whether its statute of limitations or the one contained in the Product Liability Act applies. A "product liability action" includes "all actions brought for or on account of personal injury, death, or property damage caused by, or resulting from, the manufacture, construction, design, formula, preparation, assembly, testing, service, warning, instruction, marketing, packaging, or labeling of any product." Ark.Code Ann. § 16–116–102(5) (1987). While the two statutes of limitations appear to be conflicting, we agree with the defendants that the applicable statute of limitations is the two year limitation period contained in the Medical Malpractice Act.

The Arkansas Supreme Court has addressed this precise issue. In *Adams v. Arthur*, 333 Ark. 53, 969 S.W.2d 598 (1998), the question was whether the two year limitation period contained in the Medical Malpractice Act or the three year limitation period contained in the Product Liability Act applied where the appellants were attempting to hold hospitals liable for adverse consequences arising from an allegedly defective product supplied in the course of a surgical procedure. *Adams*, 333 Ark. at 86–87, 969 S.W.2d 598. The court held that the "two-year limitations period found in the Medical Malpractice Act supersedes that found in the Product Liability Act." *Adams*, 333 Ark. at 88, 969 S.W.2d 598. It noted that although both acts were enacted in the same legislative session, "the Medical Malpractice Act, as the latter enactment within the session, may be seen as the prevailing expression of legislative intent." *Id.* In view of this,

"and in light of the all-inclusive language used by the General Assembly in defining an action for medical injury to encompass those actions 'whether based in tort, contract, or otherwise,' we conclude the Medical Malpractice Act's two-year statute of limitations governs the appellants' product-liability claims brought against the hospitals." *Id.*

Similarly, we reject Kohl's argument that Arkansas' general three year statute of limitations for tort actions applies. The Medical Malpractice Act expressly "applies to all causes of action for medical injury accruing after April 2, 1979, and, as to such causes of action, *shall supersede any inconsistent provision of law.*" Ark.Code Ann. § 16–114–202 (1987) (emphasis added).

In this case, the complaint was filed on October 8, 1999. Kohl contends the limitations period does not begin to run until the manifested damage revealed the nature of the injury. She states she was not diagnosed with heart problems until October 3, 1997, and her cause of action would not therefore be barred.

However, "[t]he date of the accrual of the cause of action [for medical malpractice] shall be the date of the wrongful act complained of and no other time." Ark. Code Ann. § 16–114–203(b) (Supp.1999). The diet drugs were voluntarily withdrawn from the market on September 15, 1997. Kohl does not dispute that this suit was filed more than two years after she last filled a prescription for the diet drugs. Accordingly, any claims Kohl has against the pharmacy defendants are barred by the statute of limitations. As her claims are barred, there is no possibility she has a right to relief against the pharmacy defendants and we conclude they were fraudulently joined. *LeBlang Motors, Ltd. v. Subaru of America, Inc.*, 148 F.3d 680, 690 (7th Cir.1998) (Employees of automobile manufacturer were fraudulently joined as defendants in fraud action brought by former owner of automobile dealership against manufacturer, and employees were

properly dismissed as defendants, where statute of limitations under Illinois law on fraud claims against employees had expired by date on which action was filed.). Removal was therefore proper.

### Conclusion.

For the reasons stated, the court will deny plaintiff's motion to remand. Defendants' motion to stay all further proceedings until a final decision is rendered by the JPML will be granted. A separate order shall be entered concurrently herewith.