2011 Ark. 44

**Virginia KOWALSKI, Individually and as Special Administratrix of the Estate of Kevin Allen Curry, Deceased, and on behalf of the Statutory Beneficiaries of the Estate of Kevin Allen Curry, Appellant**

v.

**ROSE DRUGS OF DARDANELLE, INC. and Randeep Mann, M.D., Appellees.**

No. 10–459.

Supreme Court of Arkansas.

Feb. 9, 2011.

Todd L. Griffin, Little Rock, for appellants.

Anderson, Murphy & Hopkins, L.L.P., Little Rock, by: Scott D. Provencher and Brett D. Watson, for appellee Rose Drugs of Dardanelle, Inc.

Brian G. Brooks, Attorney at Law, PLLC, by: Brian G. Brooks, for amicus curiae Arkansas Trial Lawyers Association.

DONALD L. CORBIN, Justice.

Appellant Virginia Kowalski, individually and as special administratrix of the Estate of Kevin Allen Curry, deceased, and on behalf of the statutory beneficiaries of the Estate of Kevin Allen Curry ("the Estate"), appeals from the circuit court's order granting summary judgment to Appellee Rose Drugs of Dardanelle, Inc. ("Rose Drugs"). On appeal, the Estate argues that the circuit court erred in concluding that Rose Drugs, as a pharmacy, had no general duty to warn, to not fill dangerous prescriptions, and to inquire of a prescribing physician. As this is a second appeal, our jurisdiction is pursuant to Ark. Sup. Ct. R. 1–2(a)(7) (2010).[1] We find no error and affirm.

The facts as alleged in the complaint reveal the following. On August 24, 2005, Kevin Allen Curry was found dead in his home in Dardanelle, Arkansas. Following an autopsy, his cause of death was ruled "mixed drug intoxication" combined with alcohol. Four days prior to his death, Curry saw Dr. Randeep Mann[2] for generalized facial pain resulting from a blast to the face. Dr. Mann prescribed Curry several medications, including Norflex, Zoloft, Valium, Oxycontin, Percocet, Lorazepam, Methadone, Propoxyphene, and Doxepin.[3] At the time that Curry saw Dr. Mann, he was already taking Percocet, Valium, Ambien, Trazodone, Norflex, Zoloft, Effexor, and Oxycontin. Curry had the prescriptions written by Dr. Mann filled at Rose Drug, a pharmacy owned by Appellee Rose Drugs, on August 22, 2005.

The Estate filed a wrongful-death action against Rose Drugs and Dr. Mann. It asserted therein that Dr. Mann was liable for wrongful death by his "failure to properly treat Kevin Curry and negligent prescribing of numerous medications without regard to the ramifications of those multiple prescription medications." The Estate further asserted a wrongful-death action against Rose Drugs for its "failure to properly monitor and negligent filling of numerous medications without regard to the ramifications of the multiple prescriptions." The Estate sought compensatory damages, punitive damages as against Dr. Mann, costs, postjudgment interest, and all other just and proper relief.

---

1. This court dismissed the Estate's previous appeal due to lack of a final, appealable order pursuant to Ark. R. Civ. P. 54(b) (2009). *See Kowalski v. Rose Drugs of Dardanelle, Inc.*, 2009 Ark. 524, 357 S.W.3d 432.

2. Dr. Mann is not a party to the instant appeal.

3. In his answer, Dr. Mann admitted only to prescribing Norflex, Valium, Percocet, and Methadone for Curry on August 20, 2005. Rose Drugs did not specify in its answer which drugs it filled. But, attached as exhibits to a brief in support of a motion for summary judgment were pharmacy records showing that Curry had prescriptions filled for Oxycodone, Methadone, Diazepam, Trazodone, Norflex, and Lunesta.

Rose Drugs, in its answer, admitted filling certain prescriptions for Curry, but denied the other allegations in the complaint. It subsequently filed a motion for summary judgment, asserting that the Estate's lawsuit raised a threshold question of "the scope of a pharmacist's duty to a customer in the dispensing of prescription medications." In seeking summary judgment, Rose Drugs relied on the decision in *Kohl v. American Home Products Corp.,* 78 F.Supp.2d 885, 893 (W.D.Ark.1999), wherein the Arkansas federal district court held that "pharmacies generally have no common-law or statutory duty to warn customers of the risks associated with the prescription drugs they purchase." Thus, Rose Drugs argued that the scope of its "duty under Arkansas law did not include the duty to warn Mr. Curry regarding the risks associated with the prescription medications he purchased or the duty to decline to dispense the medications prescribed by Dr. Mann."

In its response to the motion for summary judgment, the Estate argued that Rose Drugs had a duty to act carefully and that it did not do so. The Estate contended, alternatively, that there was an issue of whether the pharmacy assumed a duty in this case. Rose Drugs then replied that "[t]he duty proposed by plaintiff will require all pharmacies in Arkansas to interfere directly with the physician-patient relationship in order to avoid being held liable for performing their profession correctly."

On September 15, 2008, the circuit court held a hearing on Rose Drugs's motion for summary judgment. At the conclusion of the hearing, the circuit court ruled from the bench as follows:

I am finding for the defendant, Rose Drugs. There is no substantial issue of material fact under the *Kohl* decision, no duty other than to fill the prescription as prescribed and properly label it, and I am going to grant the summary judgment to Rose Drugs, and, again, I am relying heavily or heartily on the *Kohl* decision and I can understand you might want to take that up and I would certainly invite you to do so.

On September 29, 2008, the circuit court entered its order granting Rose Drugs summary judgment. This appeal followed.

At the outset, we note that the issue in this case is whether Rose Drugs owed Curry a duty to warn about the medications prescribed by Dr. Mann or to refuse to fill those prescriptions. This court has stated that the question of what duty, if any, is owed a plaintiff alleging negligence is always a question of law and never one for the jury. *Marlar v. Daniel,* 368 Ark. 505, 247 S.W.3d 473 (2007). A trial court may grant summary judgment only when it is clear that there are no genuine issues of material fact to be litigated and that the party is entitled to judgment as a matter of law. *Brock v. Townsell,* 2009 Ark. 224, 309 S.W.3d 179. Once the moving party has established a prima facie case showing entitlement to summary judgment, the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact. *Young v. Gastro-Intestinal Ctr.,* 361 Ark. 209, 205 S.W.3d 741 (2005). On appellate review, we determine if summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of its motion leave a material fact unanswered. *Mitchell v. Lincoln,* 366 Ark. 592, 237 S.W.3d 455 (2006). This court views the evidence in the light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. *Id.* This review is not limited to the pleadings but also includes the affidavits and other documents filed by

the parties. *Brock,* 2009 Ark. 224, 309 S.W.3d 179.

On appeal, the Estate argues that the circuit court erred in granting summary judgment in favor of Rose Drugs based on its conclusion that Rose Drugs owed no duty to Curry to reject the prescriptions written by Dr. Mann and had no duty to warn Curry of risks associated with those prescriptions. According to the Estate, the question of duty is dependent upon the foreseeability of injury and, here, Rose Drugs had a duty to foresee injury to Curry from improper dispensation of medications that were contraindicated. In advancing its argument, the Estate asserts that Rose Drugs owed Curry a duty to warn him about the dangers of the medications prescribed or should have refused to fill them because certain regulations governing pharmacies established such a duty, otherwise known as a duty by regulation. The Estate then cites to several different regulations and argues that Rose Drugs violated each regulation and thereby breached its duty to Curry. Alternatively, the Estate argues that under the particular facts of this case, a duty to warn or to not fill the prescriptions arose, even if a general no-duty rule exists.

Rose Drugs counters that the Estate misinterprets the circuit court's ruling. According to Rose Drugs, the circuit court did not rule that it owed no duty to Curry; rather, the circuit court ruled that Rose Drugs had no duty to warn about the prescriptions written by Dr. Mann, nor was it required to refuse to fill the prescriptions that were properly written. According to Rose Drugs, the instant appeal presents a purely legal question of duty; specifically, whether it owed Curry a duty to warn him regarding the risks. It further contends that the learned-intermediary doctrine requires us to reject the Estate's proposed duty for pharmacists, as the duty to warn in this case was with Dr. Mann.[4]

## I. *Duty*

■ The question of what is a pharmacist's duty in Arkansas is an issue of first impression for this court. Nevertheless, in any action for medical injury, the plaintiff must prove the applicable standard of care; that the medical provider failed to act in accordance with that standard; and that such failure was a proximate cause of the plaintiff's injuries. *See Williamson v. Elrod,* 348 Ark. 307, 72 S.W.3d 489 (2002). More specifically, to prove negligence in Arkansas, the plaintiff must show a failure to exercise proper care in the performance of a legal duty, which the defendant owed the plaintiff under the circumstances. *Marlar,* 368 Ark. 505, 247 S.W.3d 473; *Shannon v. Wilson,* 329 Ark. 143, 947 S.W.2d 349 (1997). We explained in *Marlar,* 368 Ark. at 508, 247 S.W.3d at 476, that

[t]he law of negligence requires as essential elements that the plaintiff show that a duty was owed and that the duty was breached. The question of what duty, if any, is owed a plaintiff alleging negligence is always a question of law and never one for the jury.

(Citations omitted.) Thus, the law of negligence requires as an essential element that the plaintiff show that a duty of care was owed. *Young,* 361 Ark. 209, 205

---

4. The Arkansas Trial Lawyers Association ("ATLA") filed an amicus curiae brief in the instant appeal arguing that the circuit court interpreted *Kohl,* 78 F.Supp.2d 885, too broadly. ATLA contends that the great weight of authority recognizes that a case such as this one is an exception to the no-duty-to-warn rule and that the learned-intermediary doctrine should not be extended to exempt pharmacists from a duty to warn.

S.W.3d 741; *Young v. Paxton*, 316 Ark. 655, 873 S.W.2d 546 (1994).

 Duty is a concept that arises out of the recognition that relations between individuals may impose upon one a legal obligation for the other. *Marlar*, 368 Ark. 505, 247 S.W.3d 473; *see also* William L. Prosser, *Handbook on the Law of Torts* § 42, at 244 (4th ed.1971). If no duty of care is owed, summary judgment is appropriate. *Young*, 361 Ark. 209, 205 S.W.3d 741. As previously stated, this court has heretofore not recognized that pharmacists have a common-law duty to warn or consult. The Estate would have this court recognize such a duty based on its assertion that pharmacists have certain duties imposed by regulations. In support of its argument that several regulations impose various mandatory duties on pharmacists, the Estate relies on the case of *Rose Care, Inc. v. Ross*, 91 Ark.App. 187, 209 S.W.3d 393 (2005), for the proposition that "turning" requirements established by regulations in nursing-home cases established a duty by regulation in the instant case. With this argument in mind, we turn to the regulations advanced by the Estate in support of its proposition.

## A. Controlled Substances

The first regulation relied upon by the Estate to demonstrate that Rose Drugs had a duty to warn or to refuse to fill the prescriptions is the Controlled Substances Act (CSA), codified at 21 U.S.C. §§ 801–971 (1970). Congress enacted the federal CSA in light of the|₈"substantial and detrimental effect" of "[t]he illegal importation, manufacture, distribution, and possession and improper use of controlled substances ... on the health and general welfare of the American people." 21 U.S.C. § 801(2). The CSA established a comprehensive federal system to regulate the manufacture and distribution of controlled substances, making it unlawful to manufacture, distribute, or dispense any controlled substance except as authorized by the Act. 21 U.S.C. § 841(a)(1). The CSA defines certain drugs as "controlled substances" and lists them within one of five established schedules, depending on potential for abuse and accepted medical use. In passing this Act, Congress was particularly concerned with the diversion of drugs from legitimate channels to illegitimate channels. *United States v. Moore*, 423 U.S. 122, 96 S.Ct. 335, 46 L.Ed.2d 333 (1975).

 In short, the CSA is a statutory framework for punishing individuals, including doctors or pharmacists, who engage in the distribution of certain controlled substances outside the ordinary scope of their professional practice. Criminalizing the distribution of drugs without a legitimate prescription in no way creates a legal duty that required Rose Drugs to warn Curry about the medications prescribed by Dr. Mann or to refuse to fill the prescriptions, which on their faces, were ordinary and legitimate.

 Nor does the language in 21 C.F.R. § 1306.04 (2005), relied on by the Estate, establish the existence of a civil duty. Specifically, the Estate relies on the following language, claiming that it "unequivocally" places a duty of reasonable care on pharmacists dispensing narcotics:

(a) A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course |₉of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment

or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

Although not cited by the Estate, the regulation also provides as follows:

(b) A prescription may not be issued in order for an individual practitioner to obtain controlled substances for supplying the individual practitioner for the purpose of general dispensing to patients.

(c) A prescription may not be issued for "detoxification treatment" or "maintenance treatment," unless the prescription is for a Schedule III, IV, or V narcotic drug approved by the Food and Drug Administration specifically for use in maintenance or detoxification treatment and the practitioner is in compliance with requirements in § 1301.28 of this chapter.

21 C.F.R. § 1306.04. Thus, looking at the entirety of the regulation, it is clear that a pharmacist has an obligation to ensure that any prescription for a controlled substance is legitimate according to the law. It does not unequivocally impose the duty suggested by the Estate.

This conclusion is underscored by the decision in *United States v. Hayes*, 595 F.2d 258 (5th Cir.1979), where the Fifth Circuit noted that the purpose of the regulation was to define the circumstances in which a physician or pharmacist who is registered to dispense controlled substances may nevertheless be held to have violated the proscription against manufacturing, distributing, or dispensing a controlled substance contained in 21 U.S.C. § 841. The Estate's argument that it

imposes a duty that required Rose Drugs to warn Curry about the medications prescribed by Dr. Mann is without merit.

## B. OBRA

■ Next, the Estate points to the Omnibus Budget Reconciliation Act of 1990 (OBRA), and states that this federal act, codified at 42 U.S.C. § 1396r–8, requires states to establish programs, including counseling customers concerning drug interactions and requirements for maintaining patient information and, thus, created a duty that required Rose Drugs to warn Curry. A similar argument was raised and rejected before a Florida appeals court in *Estate of Johnson v. Badger Acquisition of Tampa LLC*, 983 So.2d 1175 (Fla.Dist.Ct.App.2008). There the estate of a decedent brought suit against Badger and Omnicare who had contracted with the nursing facility where the decedent lived to provide certain pharmacy services, including consultation and dispensing of medications. The estate claimed that the decedent was a third-party beneficiary of this contractual obligation and, thus, Badger and Omnicare owed her a reasonable duty of care. In advancing its argument, the estate relied on OBRA and contended that under it there was an enhanced role of the pharmacist that created a duty that could support a negligence claim. In rejecting this argument, the Florida appeals court explained as follows:

We observe that OBRA primarily regulates how States receive federal funding for Medicare and Medicaid patient benefits. *See Concourse Rehab. & Nursing Ctr. Inc. v. Whalen*, 249 F.3d 136, 139–40 (2d Cir.2001). We note that provisions of OBRA reflect an intention to improve nursing facility resident care, *see, e.g.*, 42 U.S.C. § 1396r(b)(2), and specifically require the states to estab-

lish standards for pharmacists to perform patient counseling and record keeping, 42 U.S.C. § 1396r–8(g)(2)(A)(ii)(I)(bb), (cc), and (dd). However, we agree with other courts that have interpreted this statute and concluded that it does not create a private right of action. *Nichols v. St. Luke Ctr.,* 800 F.Supp. 1564, 1567 (S.D.Ohio 1992); *see also Tinder v. Lewis County Nursing Home Dist.,* 207 F.Supp.2d 951 (E.D.Mo.2001). Interpreting OBRA to create a legal duty in this context would invite an unusual federal encroachment into Florida common law in an area typically a subject of state regulation. *See N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 655, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995). And like other courts, we are not inclined to infer a congressional intent to preempt state law in healthcare regulation. *See id.; see also Brogdon v. Nat'l Healthcare Corp.,* 103 F.Supp.2d 1322, 1340 (N.D.Ga.2000) (holding, in part, that the Medicare and Medicaid Acts did not provide a private right of action for nursing home residents to sue the owners or operators of nursing homes).

*Id.* at 1182–83.

On the contrary, a Missouri court determined that there was a factual question regarding what duty a pharmacist had to counsel a patient regarding the effect of prescribed medications. *See Horner v. Spalitto,* 1 S.W.3d 519 (Mo.Ct.App.1999). In discussing what duty a pharmacist had, the Missouri court relied on state regulations establishing standards for the pharmacist's counseling of pharmacy customers or their caregivers that were enacted as a result of the passage of OBRA. We are more persuaded by the reasoning of the Florida court. We simply cannot say that Congress, in enacting OBRA, intended to impose a civil duty that would support a private cause of action such as one the Estate asserts in the instant case.

## C. Arkansas's Statutory & Regulatory Framework

Arkansas has also adopted a regulatory framework governing pharmacists, and the Estate argues that the state regulations were passed to protect patients such as Curry and, thus, imposed a duty to warn on Rose Drugs. First, the Estate points to Ark.Code Ann. § 17–92–101(13)[12] (Repl.2010), which sets forth the definition for "pharmacy care" and provides that it

means the process by which a pharmacist in consultation with the prescribing practitioner identifies, resolves, and prevents potential and actual drug-related problems and optimizes patient therapy outcomes through the responsible provision of drug therapy or disease state management for the purpose of achieving any of the following definite outcomes that improve a patient's quality of life:

(A) Cure of disease;

(B) Elimination or reduction of a patient's symptomology;

(C) Arresting or slowing a disease process; or

(D) Preventing a disease or symptomology.

The Estate's reliance on this statute is unavailing as it does nothing more than define what pharmacy care is. It in no way creates any type of duty such as the one advanced here.

Likewise, the Estate claims that the duties it seeks are created by the requirements set forth in regulation 9 of the Arkansas State Board of Pharmacy's Laws and Regulations. It contends that the regulation presupposes that a pharmacist will use professional judgment and

contact a treating physician if necessary. The language relied upon by the Estate provides as follows:

> (3) The pharmacist *shall be capable of communicating* appropriate information to the patient and/or caregiver and other health care professionals regarding prescription or non-prescription medications and/or medical devices, disease states, or medical conditions, and the maintenance of health and wellness.

Arkansas Bd. of Pharmacy Reg. 09–01–0004(a)(3) (2007) (emphasis added). The plain language of the regulation makes it clear that a pharmacist must be *capable* of communicating; it in no way mandates that a pharmacist has a legal duty to contact a physician. *See Morgan v. Wal–Mart Stores, Inc.*, 30 S.W.3d 455 (Tex.App. 2000) (holding that while the Texas administrative rules demonstrated that pharmacists were trusted professionals with varied and important responsibilities, they could not be reasonably read to impose a legal duty to warn). Again, this language creates no duty like the one asserted by the Estate.

In sum, the Estate can point to no statutory or regulatory framework that imposes on a pharmacist a duty to warn, to refuse to fill a legally written prescription, or to consult with a physician. The line of cases relied on by the Estate, including *Rose*, 91 Ark.App. 187, 209 S.W.3d 393, is unavailing. Here, the circuit court in reaching its decision relied in part on the decision in *Kohl*, 78 F.Supp.2d 885. There, the federal district court for the Western District of Arkansas predicted that this court "would hold that a pharmacy has a legal duty to exercise due care and diligence in the performance of its professional duties." *Id.* at 892. However, the court also held that it did not "believe this duty encompasse[d] a general duty to warn customers of potential drug side effects or to give advice on

the efficacy of the drug absent the presence of some contraindication." *Id.* The court reasoned that

> information about the risks of medicines is provided to the person who most needs and can best evaluate it—the physician—to be shared with and explained to the patient in the context of his or her individual medical circumstances. If the manufacturer has no duty to directly warn patients of the risk of drugs, it would indeed be incongruous to hold pharmacists to such a duty in the dispensing of drugs.

> Unlike the marketing system for most other products, the distribution system for prescription drugs is highly restricted. Pharmacists, as suppliers, do not freely choose which "products" they will make available to consumers in any given instance, and patients, as consumers, do not freely choose which "product" to buy. Physicians exercising sound medical judgment act as intermediaries in the chain of distribution, preempting, as it were, the exercise of discretion by the supplier-pharmacist, and, within limits, by the patient-consumer. With regard to the communication of warnings, we have recognized this as a real distinction that requires a different rule.

> To fully serve its purpose this rule must carry through to the pharmacist as well. Otherwise, the patient-consumer would be receiving information about the risks of medication, information he or she would likely be unable to properly assess and weigh, from someone unfamiliar with the patient's medical condition, after those risks had already been weighed by a physician having specific knowledge of the patient's medical needs. While the patient is entitled to know, and a doctor has a duty to inform the patient, of any dangers or side effects associated with a drug recom-

mended for treatment, we see no sound reason for imposing on pharmacists the duty to supply information about the risks of drugs that have already been prescribed. On the contrary, such a rule would have the effect of undermining the physician-patient relationship by engendering fear, doubt, and second-guessing.

*Id.* at 893 (quoting *Coyle v. Richardson–Merrell, Inc.*, 526 Pa. 208, 584 A.2d 1383, 1386 (1991)). The court then agreed that "pharmacies generally have no common-law or statutory duty to warn customers of the risks associated with the prescription drugs they purchase." *Id.*

Almost acknowledging that Arkansas does not recognize a duty such as the one advanced by it, the Estate avers that the better rule of law is that a pharmacist has a duty to contact a prescribing physician or to refuse to fill a prescription that might be dangerous to a patient.[5] In support, the Estate relies on cases from a minority of the jurisdictions that have recognized that a pharmacist has a duty beyond merely filling a prescription accurately. *See, e.g., Hooks SuperX, Inc. v. McLaughlin*, 642 N.E.2d 514 (Ind.1994) (rejecting applicability of the learned-intermediary doctrine and holding that a pharmacist had a duty to refuse to fill a prescription); *Spalitto*, 1 S.W.3d 519 (holding that in some cases a pharmacist's duty will never extend beyond accurately filling

a prescription but, in other cases, a pharmacist's education and expertise will require that he or she do more to help protect their patrons from risks that pharmacists can reasonably foresee).

We believe, however, that the better approach is that adopted by the majority of jurisdictions that there is no general duty to warn imposed on pharmacists. *See, e.g., Walls v. Alpharma USPD, Inc.*, 887 So.2d 881 (Ala.2004) (holding that to the extent that the learned-intermediary doctrine applies, the duty to determine whether the medication as prescribed is dangerously defective is owed by the prescribing physician and not by the pharmacist filling the prescription); *Cottam v. CVS Pharmacy*, 436 Mass. 316, 764 N.E.2d 814 (2002) (holding that generally a pharmacy has no duty to warn its customers of the side effects of prescription drugs); *Moore v. Mem'l Hosp. of Gulfport*, 825 So.2d 658 (Miss.2002) (refusing to impose duty to warn on pharmacist where under the learned-intermediary doctrine the physician is best situated to know the propensities of a drug and to know the needs and characteristics of his patient); *McKee v. Am. Home Prods., Corp.*, 113 Wash.2d 701, 782 P.2d 1045 (1989) (refusing to find that a pharmacist had a duty to warn of possible adverse effects of a prescription medication where to do so would require the pharmacist to question the physician's judgment); *Leesley v. West*,

---

5. The dissents seem to suggest that some type of special duty may have existed in this case. The evidence before us simply does not support such a conclusion. As Justice Hannah acknowledges in his dissent, there was evidence that Rose Drugs did in fact consult with Curry regarding the prescriptions. There was also evidence that Curry, at the time that he saw Dr. Mann, was already taking a host of medications, including several central nervous system depressors.

And, contrary to Justice Brown's dissent, we do not hold that a pharmacist will never

owe a duty to a customer. In fact, his dissent ignores the specific holding of this opinion that Rose Drugs owed Curry no general duty to warn, to refuse to fill the prescriptions, or to inquire of Dr. Mann. Moreover, Justice Brown mistakenly opines that the Pharmacy Board Regulations created a standard of care in the instant case and, thus, there was a fact question precluding the grant of summary judgment. Because there is no general duty under Arkansas law, there is no need to analyze whether there has been a breach of the standard of care.

165 Ill.App.3d 135, 116 Ill.Dec. 136, 518 N.E.2d 758 (1988) (refusing to impose a general duty to warn where such a duty would abrogate the learned-intermediary doctrine); *Morgan*, 30 S.W.3d 455 (holding that a pharmacist, who had properly filled a lawful prescription, had no duty to warn the plaintiff of adverse reactions).

Many of the jurisdictions that have refused to impose a general duty to warn have done so on the basis that the learned-intermediary doctrine places the duty to warn with the prescribing physician. Oftentimes, the underlying rationale for applying the learned-intermediary doctrine is to protect the patient-physician relationship by preventing pharmacists from second-guessing the physicians or otherwise interfering with the patient-physician relationship, which was also a factor recognized by the court in *Kohl*.

Arkansas adopted the learned-intermediary doctrine in *West v. Searle & Co.,* 305 Ark. 33, 806 S.W.2d 608 (1991). That doctrine provides an exception to the general rule that a manufacturer has a duty to warn the ultimate user of the risks of its products. This court stated as follows:

> This doctrine provides that a drug manufacturer may rely on the prescribing physician to warn the ultimate consumer of the risks of a prescription drug. The physician acts as the "learned intermediary" between the manufacturer and the ultimate consumer.

*Id.* at 42, 806 S.W.2d at 613. We further stated that there were

> a number of arguments supporting the application of this exception to prescription drug products. They may be summarized as: First, a physician must prescribe the drug, the patient relies upon the physician's judgment in selecting the drug, and the patient relies upon the physician's advice in using the drug. That is to say that there is an independent medical decision by the learned intermediary that the drug is appropriate. Second, it is virtually impossible in many cases for a manufacturer to directly warn each patient. Third, imposition of a duty to warn the user directly would interfere with the relationship between the doctor and the patient.

*Id.* The court then held that the doctrine applied to a case involving oral contraceptives. *See id.*

■ Here, in addition to the Estate's argument that the doctrine should not be applied in this case, ATLA, in its amicus brief, also argues that the circuit court's order was too broad and that the learned-intermediary doctrine does not apply to pharmacists. The Estate and ATLA's arguments are unavailing. Again, we believe the more reasoned analysis is that followed by the majority of jurisdictions that there is no general duty to warn, counsel, or refuse to fill prescriptions. As the Supreme Court of Washington observed in *McKee,* 113 Wash.2d 701, 782 P.2d 1045:

> The relationship between the physician-patient-manufacturer applies equally to the relationship between the physician-patient and pharmacist. In both circumstances the patient must look to the physician, for it is only the physician who can relate the propensities of the drug to the physical idiosyncracies of the patient. "It is the physician who is in the best position to decide when to use and how and when to inform his patient regarding risks and benefits pertaining to drug therapy." W. Keeton, R. Keeton, & D. Owen, *Prosser and Keeton on Torts* § 96, at 688 (5th ed.1984).

*Id.* at 1050–51.

We cannot say that Rose Drugs had a general duty to warn, to refuse to fill the prescriptions, or to inquire of Dr. Mann. The duty to warn of the medications' dan-

gers was with Dr. Mann, who prescribed the drugs. We therefore affirm the circuit court's order granting summary judgment in favor of Rose Drugs.

HANNAH, C.J., and BROWN, J., dissent.

JIM HANNAH, Chief Justice, dissenting.

I respectfully dissent. Rose Drugs of Dardanelle, Inc., moved for summary judgment asserting that its duty to Kevin Curry "required no more" than to fill Curry's prescriptions as ordered by Dr. Mann. The circuit court found that *Kohl v. American Home Products Corp.*, 78 F.Supp.2d 885 (W.D.Ark.1999) was persuasive on this issue and was a decision that would likely be adopted by this court. The circuit court further found that under *Kohl*, there is "no duty other than the duty to fill the prescription as prescribed and properly label it." I agree with the majority's conclusion that a pharmacist bears no general duty to advise or warn patients or doctors regarding dangers and risks that have already been properly weighed and assessed by the doctor. *See Kohl*, 78 F.Supp.2d at 893. To require a general duty to warn would undermine the physician-patient relationship. *See id.* However, Kowalski asserts a separate and distinct duty to warn based on contraindications and other concerns that should have put Rose Drugs on notice that the physician writing the prescription might have made an error or that the prescriptions had been altered. Kowalski contended that the facts in this case revealed that the dangers and risks presented by these prescriptions might not have been weighed and assessed by the doctor.

The court in *Kohl* concluded that, "absent the presence of some contraindication," a pharmacist's duty does not include a general duty to warn. *Kohl*, 78 F.Supp.2d at 892. Plaintiff's expert, Dr. Michael Horseman, testified that the prescriptions given by Dr. Mann would have resulted in multiple warnings of drug interactions on the store computer software. In other words, contraindications were present. Horseman's opinion was that in response to these warnings, and given the specific medications prescribed, Rose Drugs should have contacted Dr. Mann or warned Curry.[1]

There is more at issue in this case than just the pharmacist's duty to accurately fill and properly label a prescription. This case also presents the issue of whether a duty arises where a pharmacist has reason to believe that (1) the physician issuing the prescription has made an error, or (2) the prescription has been altered. Under such facts, there may be a duty on the part of the pharmacist to clarify the prescription with the doctor or to warn of contraindications. Such a duty does not interfere with the physician-patient relationship. It does not require the pharmacist to review and pass judgment on the propriety of the doctor's decision on prescriptions but rather assures that an error is corrected where the pharmacist's professional training and experience tells him or her that an error might have been made or that a prescription has been altered. Because I believe the circuit court erred in holding that a pharmacist has "no duty other than the duty to fill the prescription as prescribed and properly label it," I would reverse and remand this case.

1. While there is evidence in the record that Curry may have been warned, the circuit court made no finding that Curry was warned. The circuit court decided this case based on its finding that a pharmacy had no duty other than the duty to fill the prescription as prescribed and properly label it.

ROBERT L. BROWN, Justice, dissenting.

The majority holds today that pharmacists owe *no* duty to their customers to warn them of fatal prescriptions. The only duty owed, concludes the majority, is to act as robots in all situations and to properly fill and label prescriptions. This conclusion is totally at odds with the Regulations of the Arkansas Board of Pharmacy and does a disservice to the pharmaceutical profession in general by failing to recognize the high standards observed within the profession itself. Specifically, it belies the fact that pharmacists, on occasion, *should* consult with prescribing physicians about seemingly errant prescriptions and *should* counsel their customers about obvious drug interactions and contraindications. Surprisingly, the majority's discussion acknowledges no circumstances, such as lethal prescriptions or deleterious drug interactions, where a pharmacist should raise questions and consult with the prescribing physician and the customer. That goes way too far in my judgment in nullifying any duty on the part of the pharmacist. For these reasons, I dissent.

## I. *The Issue*

Four days before his death, Kevin Allen Curry was prescribed heavy dosages of Oxycodone, Methadone, Diazepam, Trazodone, Orphenadrine, and Lunesta by Dr. Randeep Mann of Russellville. Several of these drugs were central nervous system depressants, and Methadone was a controlled substance. Curry filled these prescriptions at Rose Drugs in Dardanelle as a first-time patient. He died two days later of mixed drug intoxication combined with alcohol.

Virginia Kowalski, as special administratrix of Curry's estate, filed this wrongful-death action against Dr. Mann[1] and Rose Drugs and contended that Rose Drugs was negligent in causing Curry's death by (1) failing to warn Curry of the dangers and adverse effects of this combination of drugs; (2) failing to warn Dr. Mann of the dangerous drug interactions between the combination of drugs prescribed; and (3) failing to check the various prescriptions for drug interactions and contraindications. Rose Drugs moved for summary judgment and urged that Rose Drugs did not owe a duty to warn Curry regarding the risks that might be associated with his prescription medications or to refuse to fill his prescriptions. The only duty owed Curry, according to Rose Drugs, was to fill the prescriptions according to the directions of the physician, Dr. Mann.

The circuit court's order granting summary judgment concluded that Rose Drugs had no legal duty to reject the prescriptions that were prescribed by Dr. Mann and had no legal duty to warn Curry of the risks associated with those prescriptions. The court said: "there are no genuine issues as to any material fact that Rose Drugs complied with the duty announced in [*Kohl v. American Home Products Corp.*, 78 F.Supp.2d 885 (W.D.Ark.1999) ], which was to fill the prescriptions as prescribed and properly label those prescriptions."

Hence, the issue before this court on appeal is whether a pharmacist *ever* has a duty to consult with the physician or warn a customer regarding a suspect prescription. The majority thinks not. I could not disagree more.

---

1. Appellee Dr. Randeep Mann remains a defendant in this cause of action after the circuit court granted summary judgment in favor of Rose Drugs. The jury trial against Dr. Mann was continued pending the outcome of this appeal.

## II. *Legal Duty of Care in Arkansas*

Arkansas statutory law makes it clear that pharmacists owe a duty of ordinary care and diligence to their customers. For example, the Pharmacy Code defines "pharmacy care" as "the process by which a pharmacist *in consultation with the prescribing practitioner* identifies, resolves, and prevents potential and actual drug-related *problems* and optimizes patient therapy outcomes through the responsible provision of drug therapy or disease state management." Ark.Code Ann. § 17–92–101(13) (Supp.2009) (emphasis added).

The practice of pharmacy is further defined in section 17–92–101(16)(A) as the learned profession of:

(v) *Interpreting* prescriptions for drugs, medicines, poisons, or chemicals issued by practitioners authorized by law to prescribe drugs, medicines, poisons, or chemicals which may be sold or dispensed only on prescription;

. . . .

(viii) *Advising and providing information* concerning utilization of drugs and devices and participation in drug utilization reviews;

. . . .

(x) Providing pharmacy care. . . .

Ark. Code Ann. § 17–92–101(16)(A) (Supp.2009) (emphasis added).

The Arkansas Medical Malpractice Act acknowledges that a pharmacist is a "medical care provider." Ark.Code Ann. § 16–114–201(2) (1987). And, finally, the federal district court in *Kohl* predicted that ultimately Arkansas, when faced with the issue of whether pharmacists owe a duty of care to their customers, "would hold that a pharmacy has a legal duty to exercise due care and diligence in the performance of its professional duties," based on these Arkansas statutes. *Id.* at 892. In short, there is no disagreement, except perhaps from the majority, that pharmacists owe a general duty of ordinary care to their customers. The question is whether this duty of care extends to consulting with the prescribing physician and warning customers when hazardous and dangerous situations surrounding a prescription arise.

## III. *Exceptions to the General Rule*

The rationale advanced by Rose Drugs and adopted by the majority for no duty to warn is that the physician acts as the "informed intermediary" in the chain of distribution of the drugs between the manufacturer and the patient, preempting any discretion on the part of the pharmacist. *See Kohl v. Am. Home Prods. Corp., supra.* This is the general rule adopted by a majority of jurisdictions, says the majority, but the rule is not absolute, as the majority would have us believe. For example, in the case relied on heavily by the majority, *Kohl v. American Home Products Corp., supra,* the federal district judge said: "However, we do not believe this duty encompasses a general duty to warn customers of potential drug side effects or to give advice on the efficacy of the drug *absent the presence of some contraindication.*" 78 F.Supp.2d at 892 (emphasis added). Thus, an exception is created in *Kohl.* Certainly, in the instant case, the presence of contraindicating drugs is argued as a cause of Curry's death.

In several of the cases cited by the majority from other jurisdictions, exceptions are noted to the general rule. *See Cottam v. CVS Pharmacy*, 436 Mass. 316, 764 N.E.2d 814 (2002) (court expressly did not rule on the situation where pharmacist has specific knowledge of increased danger to customer); *Moore v. Mem'l Hosp. of Gulfport*, 825 So.2d 658 (Miss.2002) (recognizing that there are exceptions to the learned-intermediary doctrine, as applied to pharmacists, where it was undisputed

that the plaintiff had informed the pharmacy of health problems which contraindicated the use of the drug in question or where the pharmacist filled prescriptions in quantities inconsistent with the recommended dosage guidelines); *McKee v. Am. Home Prods. Corp.*, 113 Wash.2d 701, 782 P.2d 1045 (1989) (court noted that under certain circumstances where there is a patent error on the prescription such as an obvious lethal dose, inadequacy of the instructions, known contraindication, or incompatible prescriptions, the pharmacist should take corrective measures); *Morgan v. Wal–Mart Stores, Inc.*, 30 S.W.3d 455 (Tex.App.2000) (recognizing that the courts that have held that pharmacists owe their customers a duty beyond accurately filing prescriptions do so based on the presence of additional factors, such as known contraindications, that would alert a reasonably prudent pharmacist to a potential problem and not disputing that a pharmacist may be held liable for negligently filling a prescription in such situations).

Furthermore, several jurisdictions have explicitly held that in certain circumstances, a duty to warn exists. *See, e.g., Riff v. Morgan Pharmacy*, 353 Pa.Super. 21, 508 A.2d 1247, 1252 (1986) (holding that the pharmacy had a legal duty to exercise due care and diligence, and that the pharmacy breached this duty "by failing to warn the patient or notify the prescribing physician of the obvious inadequacies appearing on the face of the prescription which created a substantial risk of serious harm to the plaintiff"); *Horner v. Spalitto*, 1 S.W.3d 519, 522 (Mo.Ct.App.1999) (where the pharmacist filled a central nervous system depressant along with a high dosage of a hypnotic drug known to interact with the depressant, the Missouri court reversed summary judgment finding that while in some cases the pharmacist's only duty may be to fill a prescription accurately, "in other cases, a pharmacist's education and expertise will require that he or she do more to help protect their patrons from risks which pharmacists can reasonably foresee").

## IV. Standard of Care

Several states have endorsed a standard of care for pharmacists that, under certain circumstances, includes a duty to warn. For example, in *Dooley v. Everett*, 805 S.W.2d 380 (Tenn.Ct.App.1990), the Tennessee Court of Appeals was presented with the question of whether a pharmacist had a duty to warn a customer of the potential interaction between two different prescription drugs which were prescribed for asthma. The *Dooley* court concluded that "the pharmacist has a duty to act with due, ordinary, care and diligence in compounding and selling drugs." *Id.* at 384. Moreover, the court recognized that the plaintiff had presented expert testimony that the pharmacist breached the duty owed his customer by failing to warn the customer or the prescribing physician of the potential drug interactions. And while the question of whether a duty is owed is a question of law to be decided by the court, the *Dooley* court held that the scope of the duty and whether the standard of care had been breached due to the drug interaction and combined prescriptions of the two drugs was a question to be decided by the trier of fact. For these reasons, summary judgment was not appropriate.

Also, in *Lasley v. Shrake's Country Club Pharmacy, Inc.*, 179 Ariz. 583, 880 P.2d 1129 (Ariz.Ct.App.1994), the Arizona Court of Appeals initially recognized that a pharmacy owed the customer a duty of reasonable care and then stated that the next question was whether the pharmacy breached the standard of care established because of that duty. The customer had introduced affidavits from experts averring that the applicable standard of care for

pharmacists included a responsibility to advise customers of the addictive nature of the drug, to warn of the hazards of ingesting two drugs that adversely interact with one another, and to discuss the addictive nature and long-term effects of the drug with the customer. The court, citing *Dooley*, concluded that whether the pharmacy failed to warn the patient, and thus breached its duty of reasonable care, presented a question for the jury.

## V. *Arkansas Standard of Care—Board Regulations*

The Arkansas State Board of Pharmacy has adopted a comprehensive regulation on patient care and patient counseling for pharmacists. *See* Regulation 9—Pharmaceutical Care/Patient Counseling (2004). This regulation requires the pharmacist to evaluate prescriptions and engage in "effective communication" with the customer concerning the dosage, times of administration, significant side effects, and other questions that the patient might have. Regulation 09–00–0001(a)–(d). Regulation 09–00–0001(e) also requires the pharmacy to "maintain a computer program which will identify significant drug interactions. . . . The pharmacist will be responsible for counseling the patient on these interactions with verbal and, where appropriate, written information." Regulation 09–00–0001(b)(4) further states that "the ultimate decision to use the medication or not use the medication rests with the physician who has more complete patient information." However, "[i]t is the pharmacist's responsibility to monitor the patient's medication therapy in the areas addressed in this regulation and to inform the physician of a suspected problem." *Id.*

It is absolutely clear that Regulation 9 provides a duty as pharmacists to alert physicians to potentially lethal drug combinations and drug contraindications and to counsel *and warn* customers of the risk. As already noted, the Pharmacy Code defines "pharmacy care" as "the process by which a pharmacist *in consultation* with the prescribing practitioner *identifies, resolves, and prevents* potential and actual drug-related problems and optimizes patient therapy outcomes through the responsible provision of drug therapy or disease state management." Ark.Code Ann. § 17–92–101(13) (Supp.2009) (emphasis added). Regulation 9 of the Pharmacy Board Regulations clearly requires meaningful counseling with the customer about drug dosages and significant side effects. Thus, our own statutes and Board regulations define the role of pharmacists as more than mere order fillers and specifically provide that pharmacists should work with physicians to identify, resolve, and prevent potential and actual drug-related problems and also counsel with their customers about the dosages and side effects.

In sum, Arkansas statutes and regulations go in the opposite direction from the majority which seeks to limit a pharmacist's duty to only properly filling and labeling prescriptions. Regulation 9, in particular, provides the standard of care pharmacists must provide to their customers and imposes in certain situations a duty to warn the customer and alert the prescribing physician of a serious, potentially lethal problem. The question next becomes whether there is proof that the standard was breached in the instant case.

## VI. *Expert Testimony*

In the deposition of Dr. Michael Horseman, Kowalski's expert and a pharmacist from Corpus Christi, Texas, he testified that the number of prescriptions of central nervous system depressants in the instant case and the combined large dosages more likely than not caused Curry's death. He

further testified that under the standard of care for Dardanelle, it would be inappropriate to fill large dosages of controlled substances and central nervous system depressants together. Dr. Horseman emphasized that Curry was a first-time customer and added that in this situation, the standard of care required the pharmacist at Rose Drugs to question Curry about whether he had taken these drugs before and whether he was aware that these drugs in combination are particularly dangerous drugs.

Dr. Horseman added that the pharmacist should have recognized the fact that there was a contraindication in filling these combined prescriptions and should have called Dr. Randeep Mann to confirm what was prescribed and the combination in which they were prescribed. If Dr. Mann confirmed the prescriptions, then the pharmacist at Rose Drugs had a choice of either filling them or not filling them. If he felt it was appropriate to fill them, then the pharmacist should have given both handwritten material and verbal counseling to Curry. Dr. Horseman elaborated that even if (1) the pharmacist had called Dr. Mann; (2) Dr. Mann had confirmed orally that the prescriptions were what he intended; and (3) the pharmacist had counseled Curry about the drugs, he still believed the pharmacist failed to comply with the standard of care because he had the obligation to refuse to fill the prescription unless the physician could provide documentation that the prescription was appropriate. Dr. Horseman added that the required computer system, which alerts a pharmacist to potential drug interactions, should have "red flagged" the pharmacist about the interactions involved with the multiple prescriptions.

Dr. Howell Foster, an associate professor of pharmacy at the University of Arkansas for Medical Sciences and Rose Drugs's expert, agreed that the standard of care in Arkansas requires pharmacists to follow regulations governing pharmacists, including Regulation 9 of the Arkansas State Board of Pharmacy. Dr. Foster further agreed that a pharmacist has discretion to fill or not to fill a prescription.

Dr. Harvey Ham, a pharmacist at Rose Drugs who worked the day that Curry's prescriptions were filled, testified that he did not remember filling Curry's prescriptions. He did say that Rose Drugs has a computer program that flags interactions, contraindications, and other problems with regard to prescriptions. He opined that Pharmacy Board regulations did allow pharmacists to refuse to fill prescriptions on certain occasions and that this had been done on occasion at Rose Drugs. He had no recollection of seeing Curry or filling Dr. Mann's prescriptions or knowing of any warning of drug interaction from the computer.

Dr. Lee Roy Parker, the other pharmacist working at Rose Drugs when Curry filled his prescriptions, testified that he counseled Curry for about five minutes about whether he was familiar with the medications since they were potent and advised Curry not to take the prescriptions with other medications or alcohol. He acknowledged that he had the authority to refuse to fill prescriptions. He did not recall any conversation with Dr. Mann on that day. Was Dr. Parker's conversation a sufficient warning under Regulation 9? Dr. Horseman says no. The majority says no warning was required in any event because the practice of pharmacy carries with it no such duty under any circumstances.

## VII. Conclusion

The majority opinion fails to recognize that, far from being a robot, the pharmacist is a critical link in the prescription

chain who owes a duty of due care to customers. Moreover, Pharmacy Board regulations fix a standard of care to be followed by our pharmacists, which include consulting with physicians and warning customers concerning perceived drug problems in certain circumstances. Whether the standard of care set out in these regulations was breached under these circumstances is a material question of fact that should be left up to the trier of fact to decide. Certainly, there was ample proof submitted to the court that the standard of care was breached in this case. Summary judgment obviously was inappropriate, and this case cries out for reversal. I respectfully dissent.